635 A.2d 412

**COALITION FOR OPEN DOORS et al.**

**v.**

**ANNAPOLIS LODGE NO. 622, BENEVOLENT AND PROTECTIVE ORDER OF ELKS.**

No. 94 Sept. Term, 1992.

Court of Appeals of Maryland.

Jan. 12, 1994.

Curtis A. Bradley (James C. McKay, Covington & Burling, all on brief) Washington, DC and (Susan Goering, Deborah A. Jeon, American Civil Liberties Union Foundation of Maryland, all on brief) Baltimore, for appellant.

Ronald G. Dawson (Smith, Somerville and Case, both on brief) Baltimore, and (Robert A. Dietz, Dietz and Ebersberger, on brief) Annapolis, for appellee.

Argued before MURPHY, C.J., ELDRIDGE, RODOWSKY, McAULIFFE *, CHASANOW, KARWACKI and CHARLES E. ORTH, Jr., Judge of the Court of Appeals (retired, specially assigned), JJ.

ELDRIDGE, Judge.

The principal issue in this case is whether the City of Annapolis has authority to enact an ordinance which conditions the grant or renewal of a license for a private club to sell alcoholic beverages upon proof that the club not discriminate in its membership policies on the basis of race, gender,

---

* McAuliffe, J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

religion, physical handicap, or national origin. The Circuit Court for Anne Arundel County held that, in enacting such an ordinance, the City of Annapolis exceeded the powers delegated to the City by the General Assembly in Maryland Code (1957, 1990 Repl. Vol., 1993 Cum.Supp.), Art. 2B.[1] The circuit court further held that the local ordinance conflicted with the Maryland public accommodations law.[2] Finding ourselves in disagreement with both of these holdings, we shall reverse the judgment of the circuit court.

## I.

Annapolis Lodge No. 622, Benevolent and Protective Order of Elks ("Annapolis Lodge") is a non-stock/non-profit Maryland corporation. It is also a subordinate entity within a national fraternal organization, the Benevolent and Protective Order of Elks of the United States of America ("National Elks"). The National Elks limit membership to male citizens of the United States; women are not permitted to be members. The Elks' male-only policy is binding on each subordinate lodge, and the by-laws of the Annapolis Lodge require that a member be male.

The Annapolis Lodge holds a Class C (club class) alcoholic beverage license to operate a cocktail lounge on the premises of its Annapolis clubhouse. The lounge serves members of the Annapolis Lodge, their guests, wives, and dependents, as well

---

1. Normally, state legislation delineating the powers of municipalities is set forth in Code (1957, 1990 Repl.Vol., 1993 Cum.Supp.), Art. 23A. Nevertheless, Art. 23A does not grant to municipalities the authority to regulate alcoholic beverages. *See also* Art. XI–E, § 6, of the Maryland Constitution. The General Assembly has preempted this area by Art. 2B of the Code, but, at the same time, the General Assembly has in Art. 2B delegated some of its legislative authority to other bodies. *See Sullivan v. Bd. of License Comm'rs*, 293 Md. 113, 121–123, 442 A.2d 558, 563–564 (1982); *Montgomery Co. v. Bd., Super. of Elect.*, 53 Md.App. 123, 451 A.2d 1279 (1982).

2. The state public accommodations law is located at Code (1957, 1991 Repl.Vol., 1993 Cum.Supp.), Art. 49B, §§ 5 and 8. The provision relied upon by the circuit court, Art. 49B, § 5(e), states that "this section shall not apply to a private club."

as members of the Lodge's Women's Auxiliary.[3]  According to an affidavit filed in this case by an officer of the Annapolis Lodge, the lounge does not serve members of the general public.

On April 9, 1990, the Annapolis City Council enacted Ordinance 0–11–90 Revised, which provides, in relevant part, as follows:

> "Sec. 7.12.430.  DISCRIMINATORY PRACTICE PRO-HIBITED.
>
>> A.  An establishment licensed under the [various club class] provisions . . . shall not exclude from membership solely on the basis of race, sex, religion, physical handicap or national origin in its membership." [4]

Under the ordinance, any new or renewal alcoholic beverage license application for a private club must "be accompanied by an affidavit declaring that the establishment for which the license is sought is not required by any organizational by-laws to engage in any [discriminatory] practice."  Code of the City of Annapolis (1986, Cum.Supp. No. 11, 1993), § 7.12.430(A)(1). The Annapolis Alcoholic Beverage Control Board is prohibited from issuing a license to a club that has not submitted the required documentation.  § 7.12.430(A)(2).[5]

---

**3.**  The record in this case discloses nothing concerning the nature of the Lodge's "Women's Auxiliary" or the requirements for membership in the "Women's Auxiliary."

**4.**  Ordinance 0–11–90 Revised repealed and reenacted with amendments § 7.12.240 and added § 7.12.430 to the Code of the City of Annapolis (1986, Cum.Supp. No. 11, 1993).

Hereafter, Ordinance 0–11–90 Revised will be referred to simply as "Ordinance 0–11–90" or as "the ordinance."

**5.**  At the outset, we note that while Ordinance 0–11–90 may represent a novel approach in Maryland, there are laws in several other states which condition the grant of an alcoholic beverage license upon a non-discriminatory membership or entrance policy.  *See, e.g., B.P.O.E. Lodge No. 2043 of Brunswick v. Ingraham,* 297 A.2d 607 (Me.1972), *appeal dismissed,* 411 U.S. 924, 93 S.Ct. 1893, 36 L.Ed.2d 386 (1973) (holding that the Maine Liquor Commission was within its lawful authority in denying renewal liquor licenses to 15 Elks lodges under a state statute prohibiting licensees from withholding membership on

Citing the desire to provide certain clubs a reasonable period of time in which to comply with the new law, the Annapolis City Council passed Ordinance 0–57–90 on January 14, 1991, delaying the effective date of Ordinance 0–11–90 from January 1991, until September 1, 1991, for any club

"which must apply to an international or national organization for a change in its by-laws, and which has demonstrated to the Alcoholic Beverage Control Board that it has made formal and complete application for an amendment to its by-laws to that international or national organization."

Thereafter, the Annapolis Lodge petitioned the National Elks for permission to amend its local by-laws so that women could be admitted to the Annapolis Lodge as members. The National Elks denied this request.

Unable to submit the affidavit required by § 7.12.430(A)(1), and thus potentially precluded from renewing its alcoholic beverage license, the Annapolis Lodge filed this action in the Circuit Court for Anne Arundel County on September 3, 1991, against the City of Annapolis. The Annapolis Lodge sought a declaratory judgment invalidating the ordinance and an injunction requiring the City to consider the Lodge's license renewal application without regard to the ordinance. Subsequently, the Annapolis Lodge filed a motion for summary judgment, arguing that the ordinance was invalid on two alternative grounds. First, the Lodge contended that the City of Annapolis was without authority under Art. 2B of the Maryland Code to enact Ordinance 0–11–90. Second, the Lodge argued that the ordinance conflicted with state law, in that it prohibited activities which were expressly authorized

---

basis of race); *Vaspourakan, Ltd. v. Alcoholic Beverages Control Comm'n,* 401 Mass. 347, 516 N.E.2d 1153 (1987) (upholding liquor license revocation where a nightclub deliberately discriminated against African–Americans seeking entrance in violation of a state anti-discrimination statute); *Beynon v. St. George–Dixie Lodge 1743,* 854 P.2d 513 (Utah), *cert. denied,* —— U.S. ——, 114 S.Ct. 195, 126 L.Ed.2d 153 (1993) (concluding that, by holding a private club liquor license, the Elks qualified as an "enterprise regulated by the state," and thus were subject to the anti-discrimination provisions of the Utah Civil Rights Act).

by the state public accommodations law. The City of Annapolis agreed that there was no dispute as to any material fact, and the City requested summary judgment declaring that Ordinance 0–11–90 was valid.

Following a hearing in the matter, the trial judge issued an opinion on April 16, 1992, in which he held the ordinance invalid on both grounds urged by the Annapolis Lodge. On April 29, 1992, the court issued a judgment declaring invalid Ordinance 0–11–90 and granting the Lodge's requested injunction. The circuit court took the position that, while the "delegation under Art. 2B is quite broad," City of Annapolis ordinances enacted pursuant to the authority granted by Art. 2B must have some relationship to the consumption of alcohol. The court stated that Ordinance 0–11–90 failed this test because "the ordinance regulates nothing that happens in the lounge." In addition, the circuit court's opinion held that a provision of the state public accommodations law, Art. 49B, § 5(e), embodied the General Assembly's intent to preclude a "lesser government" from regulating discrimination by private clubs.

On May 11, 1992, a majority of the Annapolis City Council voted against taking an appeal from the circuit court's judgment invalidating Ordinance 0–11–90 and enjoining its enforcement.[6] The City Council has not, however, repealed the ordinance. Four days after the City decided not to appeal, the Coalition for Open Doors, the Maryland Commission on Human Relations, and two female Annapolis residents filed a motion to intervene as defendants in the case.[7] The four

---

6. Interestingly, the City Council voted five to four against appealing the decision of the circuit court. This vote reflected a mere one vote change from the initial five to four vote in favor of enacting the anti-discrimination ordinance.

7. The Coalition for Open Doors is an organization comprised of civil rights and women's rights groups, as well as individual advocates working for the integration of private clubs across racial, ethnic, gender, and religious lines.

The Maryland Commission on Human Relations is the state agency charged with the responsibility for enforcing the provisions in Art. 49B

aldermen who had voted in favor of taking an appeal filed a separate motion to intervene as defendants. The movants' purpose in seeking intervention was to prosecute an appeal. In their memoranda and arguments before the circuit court, the movants appeared to rely on both Rule 2–214(a), relating to intervention as of right, and on Rule 2–214(b), relating to permissive intervention. The circuit court, without specifying whether it was acting under subsection (a) or subsection (b) of Rule 2–214, granted the motion to intervene filed by the Coalition for Open Doors, the Maryland Commission on Human Relations, Pamela Andersen and Carol Gerson.[8] The motion of the aldermen to intervene was denied.

Both the intervenors and the Annapolis Lodge took appeals to the Court of Special Appeals. The intervenors appealed from the injunction and the declaratory judgment invalidating Ordinance O–11–90. The Lodge appealed from the circuit court's order granting one of the motions to intervene.[9] This Court issued a writ of certiorari before any consideration of the appeals by the Court of Special Appeals, 328 Md. 462, 615 A.2d 262.

## II.

Initially, we shall address the Lodge's challenge to the circuit court's order allowing intervention for the purpose of

of the Code relating to discrimination, including the prohibition on discrimination in places of public accommodation. *Comm'n on Human Rel. v. Mass Transit*, 294 Md. 225, 227 n. 2, 449 A.2d 385, 386 n. 2 (1982).

Pamela Andersen, a lawyer, and Carol Gerson, a businesswoman, are women who desire to join the Elks or other Annapolis private clubs which have discriminated on the basis of gender.

8. Since, both in the circuit court and in this Court, the Lodge's objection to intervention and the arguments regarding intervention centered on timeliness, and since both subsection (a) and subsection (b) of Rule 2–214 require that a motion to intervene be timely filed, the failure of the trial judge to specify which subsection he relied upon in rendering his decision to allow intervention is not pertinent to the issues raised in this Court.

9. The four aldermen did not appeal from the circuit court's order denying their motion to intervene.

taking an appeal. The Annapolis Lodge argues that the trial judge erred because the motion to intervene was not timely filed. Citing some federal court decisions, the Lodge states that "[a]n analysis of the federal cases where post-judgment intervention has been allowed reveals that the federal courts have permitted such intervention only in exceptional circumstances." (Annapolis Lodge's brief in this Court at 24). Contending that no "exceptional circumstances" were present here, the Lodge argues that "the trial judge abused his discretion when he granted the motion to intervene." (*Ibid.*).

Maryland Rule 2–214 governs intervention in the circuit courts. The Rule provides in pertinent part as follows:

"**(a) Of Right.**—Upon timely motion, a person shall be permitted to intervene in an action: . . . (2) when the person claims an interest relating to the property or transaction that is the subject of the action, and the person is so situated that the disposition of the action may as a practical matter impair or impede the ability to protect that interest unless it is adequately represented by existing parties.

"**(b) Permissive.**—

(1) *Generally.*—Upon timely motion a person may be permitted to intervene in an action when the person's claim or defense has a question of law or fact in common with the action.

(2) *Governmental Interest.*—Upon timely motion the federal government, the State, a political subdivision of the State, or any officer or agency of any of them may be permitted to intervene in an action when the validity of a . . . statute . . . affecting the moving party is drawn in question in the action, or when a party to an action relies for ground of claim or defense on such . . . statute."

As the language of Rule 2–214 requires, timely application is a prerequisite for intervention. *See Maryland Radiological Society v. Health Serv.*, 285 Md. 383, 388, 402 A.2d 907, 910 (1979). Timeliness depends upon the individual circumstances of each case, "and rests in the sound discretion of the trial court, which, unless abused, will not be disturbed

on appellate review." *Maryland Radiological Society v. Health Serv., supra,* 285 Md. at 388, 402 A.2d at 910, citing *NAACP v. New York,* 413 U.S. 345, 365–366, 93 S.Ct. 2591, 2603, 37 L.Ed.2d 648, 662–663 (1973).

Neither the federal cases (including the cases cited by the Annapolis Lodge) nor the decisions of this Court set forth any special standard or requirement, such as that urged by the Annapolis Lodge, for intervention after the trial court's decision. Rather, under circumstances like those in the present case, where the losing party declines to appeal, courts generally permit an applicant to intervene for the purpose of appeal where the applicant has standing and where the applicant acts promptly after the trial court's decision. *See, e.g., United Airlines, Inc. v. McDonald,* 432 U.S. 385, 395–396, 97 S.Ct. 2464, 2470–2471, 53 L.Ed.2d 423, 432–433 (1977) ("The critical inquiry in every such case is whether in view of all the circumstances the intervenor acted promptly after the entry of final judgment.... Here, the respondent filed her motion within the time period in which the named plaintiffs could have taken an appeal"); *Yniguez v. State of Ariz.,* 939 F.2d 727, 731 (9th Cir.1991) (" 'post-judgment intervention for purposes of appeal may be appropriate if the intervenors ... meet traditional standing criteria,' " quoting *Legal Aid Soc'y of Alameda County v. Brennan,* 608 F.2d 1319, 1328 (9th Cir.1979), *cert. denied,* 447 U.S. 921, 100 S.Ct. 3010, 65 L.Ed.2d 1112 (1980)); *F.W. Woolworth Co. v. Miscellaneous Warehousemen's,* 629 F.2d 1204, 1213 (7th Cir.1980, *cert. denied,* 451 U.S. 937, 101 S.Ct. 2016, 68 L.Ed.2d 324 (1981) ("an application for intervention is timely if it is brought shortly after the [existing party representing similar interests] indicates that she will not appeal").[10]

---

**10.** We have pointed out that intervention decisions under Rule 24 of the Federal Rules of Civil Procedure serve as a guide to interpreting the Maryland intervention rule. *See Board of Trustees v. City of Baltimore,* 317 Md. 72, 90, 562 A.2d 720, 728 (1989), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990); *Maryland Radiological v. Health Serv.,* 285 Md. 383, 388 n. 5, 402 A.2d 907, 910 n. 5 (1979); *Montgomery Co. v. Ian Corp.,* 282 Md. 459, 463, 385 A.2d 80, 82 (1978);

If, as the Annapolis Lodge argues, the cases dealing with post-judgment intervention are analyzed as requiring an "exceptional circumstance" before such intervention is allowed, the requisite "exceptional circumstance" would be the losing party's failure to appeal or the real possibility that the losing party will fail to pursue appellate remedies. A recent pertinent decision by this Court is *Board of Trustees v. City of Baltimore,* 317 Md. 72, 562 A.2d 720 (1989), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990). The *Board of Trustees* case involved challenges, by the Board of Trustees of Baltimore City's employee pension systems, to city ordinances requiring that the pension systems divest their holdings in companies doing business in South Africa. Before trial, four pension fund beneficiaries moved to intervene on the side of the Board. The trial court denied the applicants' motion to intervene, and this Court held that the trial court erred. *Board of Trustees v. City of Baltimore, supra,* 317 Md. at 91–92, 562 A.2d at 729. This Court pointed out that the Board of Trustees of the municipal pension system constituted a governmental agency, that the Board had obligations to the City as well as to the beneficiaries, and that the Board's prosecution of the litigation and the appeal to this Court had been a political issue in Baltimore City. 317 Md. at 91, 562 A.2d at 729. We thus stated (*ibid.*): "The prospect that the Trustees might not ask the United States Supreme Court to review an unfavorable ruling in this Court is not entirely unlikely in light of past events. A decision not to seek Supreme Court review would adversely affect the [applicants for intervention]...." Since the applicants for intervention in *Board of Trustees* sought only to argue the appeal as parties in this Court, and to seek further review in the Supreme Court of any unfavorable ruling, this Court under Rule 8–604(e) modified the circuit court's judgment so as to grant the motion to intervene.

---

*Citizens Coordinating Comm. v. TKU,* 276 Md. 705, 712, 351 A.2d 133, 138 (1976).

The possibility feared by the intervenors in *Board of Trustees* did occur. After our decision adverse to the position of the Trustees and the beneficiaries, the Trustees decided not to seek further appellate review. Because this Court had granted intervention for the purpose of appellate review, the intervenors were able to seek review by the Supreme Court of the United States. *See Lubman v. Mayor and City Council of Baltimore City*, 493 U.S. 1093, 110 S.Ct. 1167, 107 L.Ed.2d 1069 (1990).

The *Board of Trustees* decision clearly supports the position of the intervenors in the present case. Both cases concerned the validity of local government ordinances affecting numerous persons. In both cases, the desirability of the ordinances were hotly contested political issues. In each case, a governmental entity was taking the same position concerning the validity of the ordinances which the applicants for intervention were taking. There was, however, a danger in both cases that the governmental entities would not continue because of political considerations. In *Board of Trustees*, the real possibility that the losing party would not continue to seek appellate review was deemed sufficient to justify intervention for purposes of appeal. Under the circumstances of the case at bar, the decision of the losing party not to appeal certainly justified intervention for purposes of appeal.

As previously discussed, where the losing party decides not to appeal, the cases have upheld post-judgment intervention for purposes of appeal when the applicant has the requisite standing and files the motion to intervene promptly after the losing party decides against an appeal. The two women intervenors in the present case are interested in upholding the ordinance, and they clearly have the requisite standing. *See Burning Tree Club v. Bainum*, 305 Md. 53, 59–60, 501 A.2d 817, 820 (1985), and *State v. Burning Tree Club*, 301 Md. 9, 16, 481 A.2d 785, 788 (1984).[11] The motion to intervene was filed

---

11. Since the two individual intervenors have the requisite standing, we need not explore whether the other intervenors also have standing. *See, e.g., County Council v. Md. Reclamation*, 328 Md. 229, 232 n. 1, 614

only four days after the City Council voted against an appeal. The intervenors obviously acted promptly. Under the circumstances the circuit court was fully warranted in permitting intervention.

## III.

■ Turning to the validity of the ordinance, the Annapolis Lodge contends, and the circuit court held, that the authority delegated to the City of Annapolis by the General Assembly in Art. 2B of the Maryland Code did not encompass the enactment of the ordinance.

Article 2B establishes a comprehensive scheme for the regulation, control and distribution of alcoholic beverages within this State. *See* Art. 2B, § 1, containing the declaration of legislative policy. The Article is comprised of provisions articulating general, state-wide policy concerns, as well as provisions applicable only to designated subdivisions. The provisions of Art. 2B cover a myriad of subjects. They include the typical controls on the sale and consumption of alcoholic beverages, such as the types of places which may be licensed, the types of beverages which may be sold, the hours of sale, the license fees, etc. The subjects covered in Art. 2B also include regulations concerning the premises, the conduct of licensees, ownership of establishments, membership requirements for association or club licensees, etc. For examples, Art. 2B contains provisions dealing with the nature of kitchen equipment and kitchen facilities for the preparation of food on the premises of licensees,[12] the size of dining rooms,[13] sanitary and health conditions relating to the preparation of

---

A.2d 78, 80 n. 1 (1992) (" 'Where there exists a party having standing to ... take an appeal, we shall not ordinarily inquire as to whether another party on the same side has standing,' " quoting *Board v. Haberlin*, 320 Md. 399, 404, 578 A.2d 215, 217 (1990)), and cases there cited.

12. *E.g.* Art. 2B, §§ 19(n)(4)(i), 19(p)(2)(iii)2.

13. *E.g.* §§ 19(h)(1)(ii), 19(k), 19(*l*)(2), 19(n)(1).

meals,[14] the minimum number of rooms to qualify for a hotel license,[15] landscaping and gardens for certain types of licensees,[16] the clothing to be worn by employees of a licensee,[17] the number of stories and elevators in a building to qualify for a hotel license,[18] the size of parking facilities,[19] restrictions on music,[20] requirements concerning curtains on windows,[21] the noise level of music,[22] citizenship requirements for licensees,[23] the number of boat slips for a yacht club to qualify for a license,[24] the number of tennis courts and the size of the swimming pool to qualify for a country club license,[25] and specific membership requirements for armed forces veterans clubs, fraternal clubs, etc., to be eligible for licenses.[26]

In each county and Baltimore City, the General Assembly has provided for a "Board of License Commissioners" to administer the provisions of Art. 2B.[27]   With one exception

---

14.  *E.g.* Art. 2B, § 19(s)(1).

15.  *E.g.* § 19(s)(3)(ii).

16.  *E.g.,* § 19(s)(9)(iii)(2)(B).

17.  *E.g.,* §§ 19(s)(9)(iii)(2)(D), 71A(c).

18.  *E.g.* § 19(aa)(1).

19.  *E.g.* § 30A(c)(4).

20.  *E.g.* § 121.

21.  *E.g.* §§ 116, 122.

22.  *E.g.* § 129A.

23.  *E.g.* §§ 45(a), 55, 56(b)(3).

24.  *E.g.,* § 20(c)(5)(iii)(2).

25.  *E.g.* §§ 20(c)(6)(iii)(2), 20(m)(2)(iv)4, 20(n)(6)(iv).

26.  *E.g.* §§ 20(c)(3), 20(c)(4), 20(j)(3), 20(k)(4), 20(k)(5).

27.  In twelve of the counties and Baltimore City, the members of the board are appointed by the Governor (Art. 2B, §§ 148, 148A, 149).  In five counties board members are appointed by the county commissioners (§§ 150, 151A), and in two counties by the county executives

discussed below, each county board of license commissioners generally exercises its authority and carries out the provisions of Art. 2B throughout the entire county. The boards generally are granted certain enumerated powers by Art. 2B, § 158; in addition, other provisions of Art. 2B relate to specific powers and duties of particular boards. The General Assembly has also conferred rule-making authority on the county boards in § 184(a), which provides as follows:

> "(a) *Generally.*—In addition to the powers otherwise provided by this article, the Comptroller and the board of license commissioners from any county or Baltimore City, respectively, have full power and authority to adopt such reasonable rules and regulations as they may deem necessary to enable them effectively to discharge the duties imposed upon them by this article."

For a discussion of the scope of a county board's rule-making authority under this provision, *see Sullivan v. Bd. of License Comm'rs,* 293 Md. 113, 124, 442 A.2d 558, 564 (1982) (stating that the power delegated to a county board of license commissioners "to make rules is not the power to make laws").

As previously indicated, Art. 2B provides one exception to the above-described regulatory scheme. That exception relates to the authority of the City of Annapolis concerning alcoholic beverages. Article 2B, § 152, states that "[t]he Board of License Commissioners of Anne Arundel County shall have no jurisdiction in the City of Annapolis." Section 152 also provides that the Mayor and Aldermen of Annapolis may themselves act as a board of license commissioners "or may delegate all or any portion of the authority to regulate alcoholic beverage licensees to a subsidiary Board established by the Mayor and Aldermen."

More significantly, the authority over alcoholic beverage licenses granted by the General Assembly to the City of Annapolis is considerably broader than the authority granted

---

(§§ 150(c), 150(e)). In the remaining four counties, certain other officials are ex officio the members of the boards of license commissioners (§§ 151, 153, 159(c)(6)).

to the county boards of license commissioners. Article 2B, § 158(d), states in pertinent part as follows (emphasis added):

"In Anne Arundel County (1) the Mayor, Counsellor and Aldermen of Annapolis shall have the power to make and enforce such rules, regulations and restrictions, *in addition to, or in substitution of, those contained in this article,* but not inconsistent therewith, as in the judgment of the Mayor, Counsellor and Aldermen of the City of Annapolis would give the municipality more effective control of each of the places of business."

Pursuant to this authority, the Mayor and Aldermen of Annapolis have enacted a detailed scheme for the regulation of alcoholic beverages in Annapolis, set forth in Ch. 7.12 of the Code of the City of Annapolis (1986, Cum.Supp. No. 11, 1993). With respect to matters not covered by Ch. 7.12, the Mayor and Aldermen of Annapolis have incorporated by reference the provisions of Art. 2B of the Maryland Code.[28] In addition, there are a few provisions in Art. 2B which are expressly directed to the City of Annapolis, and, in light of Art. 2B, § 158(d)(1), the City may not enact ordinances inconsistent with those provisions.[29] There are also numerous provisions in Art. 2B applicable in Anne Arundel County that either contain express exclusions for the City of Annapolis or are tied to the Anne Arundel County Board of License Commissioners'

---

**28.** Section 7.12.020 of the Annapolis Code states as follows:
**"7.12.020  Applicability of state law.**
    Except as otherwise provided in this chapter, the provisions of Article 2B of the Annotated Code of Maryland (1957 Edition and supplements) apply to the sale, consumption and licensing for sale of alcoholic beverages in the city."
In §§ 7.12.030–7.12.090, of the Annapolis Code, the City of Annapolis has created an alcoholic beverage control board and delineated the powers and duties of the board.

**29.** *See* Art. 2B, §§ 17A (relating to beer and light wine licenses), 19A (authorizing the City to issue a beer, wine and liquor license for consumption on the premises only), 39G (relates to the Annapolis Wine Festival), 63(c) (concerns the collection of license fees), 121(b) (prohibits dispensing alcoholic beverages to minors).

jurisdiction which does not encompass the City of Annapolis.[30]

The authority over alcoholic beverage licensees granted by the General Assembly to the City of Annapolis in Art. 2B, § 158(d)(1), is very broad. Ordinance 0–11–90, conditioning an alcoholic beverage license upon a non-discriminatory membership policy by a club licensee, falls within § 158(d)(1)'s authorization to enact provisions and restrictions "in addition to, or in substitution of, those contained in this article . . . as in the judgment . . . of the City of Annapolis would give the municipality more effective control of each of the places of business." The Annapolis Lodge has not argued that Ordinance 0–11–90 is inconsistent with any provision in Art. 2B, and we have discovered no such inconsistency.

Although recognizing that the General Assembly's delegation of authority to the City of Annapolis "is quite broad," the circuit court held that an Annapolis ordinance enacted pursuant to the delegation in Art. 2B, § 158(d)(1), must have some relation to "the consumption of alcohol" or to "what happens in the lounge," and that Ordinance 0–11–90 "has nothing to do with the consumption of alcohol except that it would deprive the Elks of their license." In this Court, the Annapolis Lodge similarly argues that "[a] club's membership restrictions do not have any necessary connection to who may be permitted to use a particular one of its facilities. In the case of [the Annapolis Lodge], even though club membership is limited solely to men, the use of the lounge is not similarly limited. The lounge is open not only to the male members, but also to their female guests, wives and dependents, and members of the Elk's Womens Auxiliary." (Annapolis Lodge's brief at 16).

Nevertheless, Ordinance 0–11–90 has no less connection with the consumption of alcohol at a club or "what happens in the lounge" than many of the provisions of Art. 2B containing requirements for various private club licenses. For example, Art. 2B, § 20(*o* )(2) (1993 Cum.Supp.), provides that, for a

---

**30.** *See, e.g.,* Art. 2B, §§ 19(c), 19A, 28, 28(d), 28(j)(5), 42(b), 46(a–1)(1), 57, 60(d), 63(c), 69(c), 74(e), 74(f), 85(a), 85(b)(2), 85(c)(2), 92(f) and (g), 121(a)(4).

country club to be eligible for a liquor license in Howard County, it must have an 18 hole golf course. On the other hand, in several counties, a nine hole golf course will suffice.[31] In other counties to be eligible for a country club license, the club must maintain either a golf course or a swimming pool of a specified size.[32] In still other counties, there is no requirement of either a golf course or a swimming pool for a country club license.[33] Other categories of private club licenses, *i.e.*, yacht clubs, racket clubs, fraternal clubs, etc., have similar types of eligibility requirements.[34]

Turning specifically to membership criteria for private club eligibility for alcoholic beverage licenses, Art. 2B is replete with requirements relating to membership even though relatives or guests of members may drink at the clubs. For example, in most counties there are specific provisions for alcoholic beverage licenses for armed forces "veterans" clubs. In several of these counties, in order for an armed forces veterans club to obtain a license, it must be composed entirely of persons who were members of the United States armed forces during time of war, whereas in other counties, a veterans club may include among its membership veterans who had served only in peacetime.[35] There are other provisions of Art. 2B, relating to various types of private club alcoholic beverage licenses, setting forth eligibility requirements concerning the residency of club members, the residency of officers, the voter and taxpayer status of officers, the annual dues of members,

---

31. *See, e.g.,* Art. 2B, §§ 20(c)(7), 20(h)(3), 20(*l*)(6), 20(m)(2)(iv)(4).

32. *See, e.g.,* Art. 2B, §§ 20(n)(6)(iv), 20(q)(2)(iii).

33. *See, e.g.,* §§ 20(b), 20(e), 20(g)(4), 20(k), 20(s)(3)(ii), 20(u).

34. *See, e.g.,* §§ 20(c)(5), 20(m)(2)(iv)(3), 20(n)(6)(iii), 20(n)(6)(v), 20(r)(4).

35. *Compare, e.g.,* Art. 2B, §§ 20(c)(3), 20(j)(3), 20(k)(4), 20(m)(2)(iv), 20(n)(6)(i), 20(r)(2)(iii), 20(s)(3)(i), *with* Art. 2B, §§ 20(g)(4)(iii), 20(*l*)(3), 20(q)(5), 20(v)(4). In a few counties, only veterans clubs affiliated with the American Legion or Veterans of Foreign Wars are eligible for a veterans club license. *See, e.g.,* § 20(f)(2)(iii).

initiation "rites" for members, numbers of members, etc.[36] As previously indicated, Annapolis Ordinance 0–11–90 has just as much, or just as little, connection with the consumption of alcohol at the club as these provisions of Art. 2B have.

The General Assembly has delegated to the City of Annapolis the authority to enact provisions regulating alcoholic beverages and licenses "in addition to, or in substitution of, those contained in this article [2B]." *See* Art. 2B, § 158(d)(1). In light of this, there is no basis for concluding that an alcoholic beverage regulatory ordinance enacted by the City of Annapolis, concerning private club licenses, must have a closer connection with the consumption of alcohol at the club than the provisions of Art. 2B itself concerning private club licenses.

Moreover, unless a private club is open to the general public, an ordinance conditioning an alcoholic beverage license upon the removal of a membership restriction does have some connection with who may purchase alcoholic beverages at the club's facilities. Compliance with such an ordinance obviously broadens the categories of persons who may drink alcoholic beverages in the club. There may be many women who desire to use the alcoholic beverage service of the Annapolis Lodge, who are not married to or dependents of or regular guests of existing members, who are not eligible for the "Womens Auxiliary," [37] but who would be eligible for membership if the Annapolis Lodge did not discriminate on the basis of gender. As the Supreme Judicial Court of Maine said with regard to membership restrictions based on race in *B.P.O.E. Lodge No. 2043 of Brunswick v. Ingraham,* 297 A.2d 607, 615 (Me.1972), *appeal dismissed,* 411 U.S. 924, 93 S.Ct. 1893, 36 L.Ed.2d 386 (1973), discriminatory membership practices have

---

**36.** *See, e.g.,* Art. 2B, §§ 20(c)(4)(iii), 20(c)(5)(v), 20(c)(6)(iii), 20(c)(6)(v), 20(g)(4), 20(h)(3)(v), 20(i)(3), 20(k)(3)(ii), 20(k)(4)(ii), 20(k)(5), 20(*l*)(5)(v), 20(*l*)(6)(v), 20(*l*)(7)(iii), 20(*l*)(7)(iv), 20(*l*)(8), 20(m)(2)(iv), 20(n)(6), 20(*o*)(3)(iii), 20(p)(3), 20(q)(2)(iii), 20(q)(2)(v), 20(q)(4)(i), 20(q)(6)(iii), 20(r)(2)(iii), 20(r)(3)(iii), 20(r)(4)(iii), 20(r)(5)(iii), 20(u)(3), 20(u)(4).

**37.** *See* note 3, *supra.*

"operative practical consequences ... upon the opportunities of persons ... to purchase intoxicating liquors for beverage purposes. To the extent that there is restriction in the membership of the [Elks] on the arbitrary basis of race or color, to that extent some human beings in the State of Maine, arbitrarily because of their racial origin or color, are, ipso facto, excluded from opportunity, which they might otherwise have had, to purchase intoxicating liquors for beverage purposes."

In any particular area, there are limits to the number of alcoholic beverage licenses which may be issued. The City of Annapolis, by deciding to award private club licenses to clubs that do not discriminate on the basis of race, gender, etc., instead of to clubs which exclude members of a particular race or gender, has decided that a broader range of the adult population should have the opportunity to enjoy alcoholic beverages at clubs. While guests and dependents of members may also use the clubs, nondiscriminatory membership criteria increase the number of persons falling within the categories of guests and dependents. In this respect, Ordinance 0–11–90 does have a relationship to the consumption of alcoholic beverages at private clubs in Annapolis.

The City of Annapolis was authorized, under Art. 2B, § 158(d)(1), to enact Ordinance 0–11–90.[38]

### IV.

The Annapolis Lodge alternatively argues, and the circuit court alternatively held, that Annapolis Ordinance 0–11–90 conflicts with the state public accommodations law.

The Maryland public accommodations law, in Art. 49B, § 5(a), provides in pertinent part as follows:

---

**38.** Our holding in this case is, of course, limited to the authority of the City of Annapolis under Art. 2B, § 158(d)(1). Whether a county board of license commissioners would have authority to promulgate a regulation like Ordinance 0–11–90, under the delegation in Art. 2B, § 184(a), or under any other provision of Art. 2B, is an issue not before us in this case, and we intimate no views upon the matter.

"(a) It is unlawful for an owner or operator of a place of public accommodation or an agent or employee of the owner or operator, because of the race, creed, sex, age, color, national origin, marital status, or physical or mental handicap, of any person, to refuse, withhold from, or deny to such person any of the accommodations, advantages, facilities and privileges of such place of public accommodation."

Subsection (c)(2) of § 5 provides that a place of public accommodation within the meaning of the section includes, *inter alia,* a "facility" engaged in selling "alcoholic beverages for consumption on or off the premises." Subsection (e), however, states as follows:

"(e) The provisions of this section shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishments are made available to the customers or patrons of an establishment within the scope of this section."

The Annapolis Lodge argues that subsection (e) "permits private clubs to establish their own membership criteria" and that "the intent of the legislature was to permit the excluded group to discriminate if they so choose." (Annapolis Lodge's brief in this Court at 10, 12). The Annapolis Lodge contends that § 5(e) is similar to the statute involved in *State v. Burning Tree Club, Inc.,* 315 Md. 254, 294–296, 554 A.2d 366, 386–387, *cert. denied,* 493 U.S. 816, 110 S.Ct. 66, 107 L.Ed.2d 33 (1989), where "the Court of Appeals recognized that . . . the legislature was permitting clubs to engage in a limited form of discrimination." (Annapolis Lodge's brief at 13). The Annapolis Lodge concludes that, because Ordinance 0–11–90 "conflicts with the permission to discriminate embodied in Article 49B, Section 5(e) . . ., the local law must yield and it is invalid." (*Id.* at 14.)

■ A local government ordinance which conflicts with a public general law enacted by the General Assembly is preempted and thus is invalid. *See, e.g., Boulden v. Mayor,* 311 Md. 411, 415–417, 535 A.2d 477, 479–480 (1988); *Rockville Grosvenor v. Montgomery County,* 289 Md. 74, 93–99, 422

A.2d 353, 364–367 (1980); *Mont. Co. Bd. of Realtors v. Mont. Co.*, 287 Md. 101, 107–110, 411 A.2d 97, 100–102 (1980); *Annapolis v. Annap. Waterfront Co.*, 284 Md. 383, 391–393, 396 A.2d 1080, 1085–1086 (1979); *County Council v. Investors Funding*, 270 Md. 403, 421–423, 312 A.2d 225, 235–237 (1973); *City of Baltimore v. Sitnick & Firey*, 254 Md. 303, 312–317, 255 A.2d 376, 380–382 (1969).

We have stated that " '[a] local ordinance is preempted by conflict when it prohibits an activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law.' " *Allied Vending v. Bowie*, 332 Md. 279, 297 n. 12, 631 A.2d 77, 86 n. 12 (1993), quoting *Talbot County v. Skipper*, 329 Md. 481, 487 n. 4, 620 A.2d 880, 882–883 n. 4.[39] In applying this principle, however, our cases have recognized a distinction between a state law which is intended to permit or authorize a particular matter and a state law which is simply intended to exempt the particular matter from its coverage. When a state law simply excludes a particular activity from its coverage, our cases have not attributed to the General Assembly an intent to preempt local legislation regulating or prohibiting that activity. Instead, in such situations supplementary local legislation has not been deemed to be in conflict with and preempted by the state statute. *National Asphalt v. Prince Geo's Co.*, 292 Md. 75, 79, 437 A.2d 651, 653 (1981); *Annapolis v. Annap. Waterfront Co., supra*, 284 Md. at 391–393, 396 A.2d at 1085–1086; *City of Baltimore v. Sitnick & Firey, supra*, 254 Md. at 312–326, 255 A.2d at 380–386.

Thus, in *City of Baltimore v. Sitnick & Firey, supra*, a state minimum wage law, *inter alia*, excluded from its coverage

---

**39.** Not all conflicts between state public general law and local law neatly fall within this "prohibit-permit" principle. A local law may conflict with a state public general law in other respects and will, therefore, be preempted. *See, e.g., Montgomery County v. Board of Elections*, 311 Md. 512, 536 A.2d 641 (1988) (state law and local law provided two different and irreconcilable methods for appointing the same public officials); *East v. Gilchrist*, 296 Md. 368, 463 A.2d 285 (1983); *Mont. Co. Bd. of Realtors v. Mont. Co.*, 287 Md. 101, 411 A.2d 97 (1980).

taverns whereas a local minimum wage ordinance covered the taverns, and one of the issues before this Court was whether the local law was in conflict with the state statute in this regard and therefore was invalid. The trial court in *Sitnick*, like the trial court in the present case, reasoned that the state statute's mere exclusion of certain entities indicated a legislative intent that such entities be free of regulation by local law. In reversing the trial court and holding that the local ordinance was not in conflict with the state statute, this Court in *Sitnick* pointed out that the " 'fact that an ordinance enlarges upon the provisions of a [state] statute by requiring more than the statute requires creates no conflict....' " *Sitnick*, 254 Md. at 317, 255 A.2d at 382. The Court went on (*ibid.*):

"A distillation of the opinions we have cited leaves the residual thought that a political subdivision may not prohibit what the State by general public law has permitted, but it may prohibit what the State has not *expressly* permitted. ... [T]he State's prohibition of certain activity in a field does not impliedly guarantee that all other activity shall be free from local regulation and in such a situation the same field may thus be opened to supplemental local regulation."

Later, in language directly applicable to the Annapolis Lodge's argument in the present case, the Court in *Sitnick* concluded that a mere exclusion from regulation in the state statute did not indicate a state legislative intent that the excluded entities be free of regulation (254 Md. at 324, 255 A.2d at 385–386):

"The lower court in its opinion reasoned that it was the legislative intent, that where the State law created an exemption, it intended by specific exclusion to free those businesses in the excluded categories from any regulation, and it meant this privilege to extend to freedom from regulation by local law. However, we are of the opinion that the more logical deduction is that the State exemption amounts to no regulation at all and accordingly leaves the field open for regulation at the local level."

Very much in point is this Court's decision in *National Asphalt v. Prince Geo's Co., supra,* 292 Md. at 79, 437 A.2d at

653. Whereas the present case involves the public accommodations provisions of Art. 49B and the exclusion of private clubs from the coverage of the state statute, *National Asphalt* involved the prohibitions in Art. 49B against employment discrimination and the exclusion of employers with less than fifteen employees from the coverage of the state statute. *See* Art. 49B, § 15(b). While the state statute prohibiting employment discrimination exempts from its coverage employers with less than fifteen employees, Prince George's County enacted an ordinance which did prohibit employment discrimination by employers with less than fifteen employees. National Asphalt, which was covered by the local ordinance but exempt from the state statute, argued that the local ordinance was both preempted by the State's asserted occupation of the field and, alternatively, was preempted by conflict. This Court rejected both arguments and upheld the local ordinance. With regard to the conflict argument, we stated (292 Md. at 79, 437 A.2d at 653):

"Employers with less than fifteen employees are not permitted by the state statute to discriminate in their employment practices; they simply are not covered."

The Court continued (*ibid.* n. 3):

"For this reason, there is no merit to National Asphalt's alternate argument that there is a conflict between the state law and the Prince George's County ordinance to the extent that the latter covers employers with less than fifteen employees. The state statute would have to *permit* discrimination by employers with less than fifteen employees for there to be a conflict under the test set forth in our cases. *Mayor and Council of Forest Heights v. Frank,* 291 Md. 331, 337, 435 A.2d 425 (1981); *City of Baltimore v. Sitnick & Firey,* 254 Md. 303, 313–317, 255 A.2d 376 (1969), and cases there cited."

The language of the state public accommodations law, which excludes private clubs from its coverage, is similar to the language of the state employment discrimination prohibition law involved in *National Asphalt,* which excludes small em-

ployers from its coverage, and is similar to the state minimum wage law involved in *Sitnick*, which excluded taverns from its coverage. The provision of the state public accommodations law relied on by the Annapolis Lodge, Art. 49B, § 5(e), does not *permit* discrimination by private clubs. It simply excludes private clubs from the coverage of the state law. Instead of constituting an affirmative authorization to discriminate like the statute in *State v. Burning Tree Club, Inc., supra*, 315 Md. at 294–296, 554 A.2d at 386–387, § 5(e) merely removes private clubs from the scope of the state public accommodations law.[40] Consequently, under this Court's holdings in *Sitnick* and *National Asphalt*, there is no conflict between Art. 49B, § 5(e), and Annapolis Ordinance 0–11–90.

The circuit court erred in declaring Ordinance 0–11–90 invalid and enjoining its enforcement.

*ORDER OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY GRANTING INTERVENTION AFFIRMED. OTHERWISE, THE JUDGMENT OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY IS REVERSED, AND THE CASE IS REMANDED TO THAT COURT FOR THE ENTRY OF A DECLARATORY JUDGMENT IN CONFORMANCE WITH THIS OPINION. COSTS TO BE PAID BY ANNAPOLIS LODGE NO. 622, BENEVOLENT AND PROTECTIVE ORDER OF ELKS.*

---

**40.** The Annapolis Lodge's reliance upon *State v. Burning Tree Club, Inc.*, may also be misplaced on another ground. If Art. 49B, § 5(e), were like the statute involved in *Burning Tree* as argued by the Annapolis Lodge, the result in this case might well be the same for an entirely different reason. While not mentioned in the Annapolis Lodge's brief, the state statute involved in *Burning Tree*, which expressly drew classifications based on gender, and which expressly authorized certain gender discrimination while prohibiting other discrimination, was held unconstitutional under Article 46 of the Maryland Declaration of Rights. If Art. 49B, § 5(e), were also construed as affirmatively authorizing discrimination based on race, gender, etc., a substantial question about § 5(e)'s validity under Articles 24 and 46 of the Declaration of Rights would be presented. And if § 5(e), as so construed, were invalid, there would be no viable state statute with which Ordinance 0–11–90 conflicted.