Dear Lance W. Billingsley, Esquire
On behalf of the City of Hyattsville, you have requested our opinion whether State law requires the City Council to approve a particular budgetary action by a supermajority vote.
Your inquiry arises out of a proposal during the course of the fiscal year to use money from the City's general fund to cover unanticipated expenditures of the municipal police department. Your inquiry raises two related questions, which we summarize as follows:
(1) Does a supermajority provision in Annotated Code of Maryland, Article 23A,
2(b)(2), apply to this type of proposal and thus make approval contingent on a two-thirds vote?
(2) Assuming that Article 23A, 2(b)(2) applies and that Hyattsville's charter itself does not require a supermajority to approve this type of action, does the supermajority requirement violate the municipal home rule amendment, Article XI-E of the State Constitution?
In our opinion, the answers to these questions are as follows:
 (1) Because the Council's action is best characterized as a supplemental appropriation, the supermajority requirement in Article 23A, 2(b)(2) applies.
 (2) Article 23A, 2(b)(2) is a public general law, applicable to every municipality governed by Article XI-E of the Constitution, and therefore does not violate the municipal home rule amendment. In any event, the municipal charter and the statute can be construed harmoniously so that no conflict exists.
 I. Background
Hyattsville is a municipal corporation subject to Article XI-E of the State Constitution, commonly referred to as the municipal home rule amendment. The governing body of Hyattsville consists of the mayor and 10 council members. Hyattsville Charter, C2-1, 4 Municipal Charters of Maryland, ch. 78.[1] Like charters of numerous municipal corporations throughout the State, the Hyattsville Charter was modeled after former Article 23B of the Annotated Code of Maryland. [2]
When it adopted the municipal budget for the current fiscal year, the Hyattsville City Council appropriated specific funding for each department of the municipal government, including the police department. During the course of the fiscal year, a proposal was made to use part of the unreserved fund balance available in the City's general fund to acquire additional vehicles and a rebuilt engine for the police department. A majority of the Council, but fewer than two-thirds of the members, supported the proposal.
You provided us with a detailed analysis arguing that the Council could approve the fund transfer by a simple majority vote. You noted that C5-8 of the Hyattsville Charter provides that "any transfer of funds between major appropriations for different purposes shall be approved by the Council. . . ." You also referred to C2-3(k) as the Charter procedural provision governing such transfers. That section requires "[a]t least six (6) affirmative votes . . . for the passage of . . . ordinances, resolutions, or laws," i.e., a simple majority of the body.
At least one Council member argued that a two-thirds majority vote was required to approve the transfer. You included with your inquiry a letter from the councilman, explaining his position in detail and citing Article 23A, 2(b)(2). That statute provides:
In addition to, but not in substitution of, the powers which have been, or may hereafter be, granted to it, [a municipal] legislative body also shall have the following express ordinance-making powers:
(2) To expend municipal funds for any purpose deemed to be public and to affect the safety, health, and general welfare of the municipality and its occupants, provided that funds not appropriated at the time of the annual levy, shall not be expended, nor shall any funds appropriated be expended for any purpose other than that for which appropriated, except by a two-thirds vote of all members elected to said legislative body.
Article 23A, 2(b)(2) (emphasis supplied).
In your letter, you argued that the supermajority requirement prescribed in Article 23A, 2(b)(2) did not pertain to the Council's action, because the funds had previously been appropriated that is, for unanticipated expenditures and the transfer in question was consistent with that purpose. Furthermore, you suggested that, to the extent Article 23A, 2(b)(2) conflicts with the Hyattsville Charter, it is inconsistent with the principles of municipal home rule. You asked w hether we agree with that analysis.
 II Whether the Supermajority Requirement Applies
We first address whether or not the Council's fund transfer comes within the scope of the supermajority provision of Article 23A, 2(b)(2). That provision applies if the funds in question were "not appropriated at the time of the annual levy" or if the proposed expenditure is "for any purpose other than that for which [the funds were] appropriated."
A. Hyattsville Budget Process
The Hyattsville Charter sets out detailed procedures governing municipal finances.
At least 32 days before the start of the fiscal year, the Mayor, or the Finance Committee Chairman acting at the direction of the Mayor, must submit to the Council a proposed balanced budget, providing a complete financial plan for the municipal government for the following fiscal year. The Council must hold a public hearing on the proposed budget, after which it may either increase or reduce proposed expenditures. If the Council increases spending, it must also provide for increased revenues. The budget must be prepared and adopted in the form of an ordinance by at least a majority of the Council. See Hyattsville Charter, C5-4 through C5-6. Absent an appropriation by the Council, public money may not be spent. Id., C5-7. Under the Charter, any transfer of money between major appropriations for different purposes requires Council approval.
Id., C5-8.
You indicate that the Council allocates excess anticipated revenue,[3]
including surplus funds available at the close of the prior fiscal year, to the unreserved fund balance in the City's general fund. We understand that this balance is treated as a reserve fund, available to cover unanticipated expenditures during the course of the fiscal year. In other words, surplus revenues apparently are treated as a rainy day account.
However, unlike a nonlapsing reserve fund, if revenue in the general fund is not spent during the fiscal year, it is included as anticipated revenue for the subsequent fiscal year. Charter, C5-10.
You suggest that, to the extent that the Council allocates to the general fund a specific level of anticipated revenue earmarked for unanticipated expenditures at the time the budget is adopted, the Council has in fact "appropriated the money" for a designated purpose i.e., unanticipated expenditures. Thus, you reason, the supermajority requirement of Article 23A, 2(b)(2) simply does not apply to the Council's action to devote those funds to a specific unanticipated expenditure, because the funds have already been appropriated for that purpose.
We respectfully disagree with that conclusion because we do not believe that the allocation of funds to the unreserved balance of the City's general fund is itself an appropriation.
B. What Constitutes an Appropriation
The Court of Appeals has described an "appropriation" as an authorization to disburse funds. City of Annapolis v. Anne Arundel County, 347 Md. 1, 12, 698 A.2d 523 (1997). Leading treatises on municipal law define an "appropriation" as "the setting apart of a designated sum for a particular purpose or purposes"[4] and "an authorization granted by a legislative body to make expenditures and to incur obligations for a specific purpose."[5] Essentially, an appropriation permits the expenditure of public money for a legislatively authorized public purpose.
Of course, the level of detail in an appropriation may vary depending on the budget system that a municipality employs.[6] The level of detail in the budget, in turn, will affect the application of the supermajority requirement. But an "appropriation" under any type of budgetary format requires some level of specificity beyond "unanticipated expenditures."[7] In our view, the setting aside of anticipated revenues for no purpose other than "unanticipated expenditures" lacks the necessary specificity to constitute an appropriation. Rather, the Council's action in setting aside surplus revenue at the time the budget was adopted is better described as apportionment of revenue to a specified fund for unanticipated expenditures, short of an "appropriation." See 15 McQuillin, The Law of Municipal Corporations, sec; 39.65.
Thus, in our opinion, the unreserved fund balance in the City's general fund was not "appropriated" at the time of adoption of the municipal budget, even if it was earmarked generally for unanticipated expenditures. A later authorization to spend those funds for police equipment was therefore a mid-year supplemental appropriation that triggered the supermajority requirement under Article 23A, 2(b)(2).[8]
We next consider whether application of the supermajority requirement of Article 23A, 2(b)(2) in these circumstances would violate the constitutional principle of municipal home rule.
 III. Constitutionality of Supermajority Requirement
A. Municipal Home Rule
The municipal home rule amendment to the State Constitution, ratified by the voters in 1954, was intended to allow municipalities to govern themselves in local matters. Inlet Associates v. Assateague House Condominium Association, 313 Md. 413, 425, 545 A.2d 1296 (1988). The hom e rule amendment grants a municipality the authority "to amend . . . an existing charter . . . relating to the incorporation, organization, government, or affairs of said municipal corporation" in accordance with the Constitution and its implementing legislation.
Article XI-E, Sec;3 and 4; see also Article 23A, 11-18. Subject to limited exceptions not pertinent here, the General Assembly is prohibited from enacting legislation for municipalities except by public general law applicable to every municipality in a permissible class. Article XI-E, 1; see also 58 Opinions of the Attorney General 153 (1973).[9]
In Article 23A of the Annotated Code of Maryland, the General Assembly has implemented the home rule amendment. Article 23A, 1 grants the governing body of a municipal corporation the power to "pass and adopt . . . ordinances, resolutions, or bylaws necessary or proper to exercise the powers [granted the municipality]," while sec; 2 implements Article XI-E by a grant of express powers. [10] Inlet Associates,313 Md. at 425.
Thus, the governing body of a municipality derives its legislative authority from two distinct sources — (1) the municipal charter, and (2) public general law enacted by the General Assembly. See, e.g., McRobie v. Town of Westernport, 260 Md. 464, 470, 272 A.2d 655 (1971) (municipal corporation may obtain authority to dispose of property held in governmental capacity through either public general law or charter amendment); see also 80 Opinions of the Attorney General 227, 229 (1995). The two sources of authority may in some circumstances overlap.[11]
If there is a conflict between a municipal charter and a public general law, the public general law controls. In particular, the Constitution provides that "[a]ll charter provisions . . . adopted under [Article XI-E] shall be subject to all applicable laws enacted by the General Assembly;" Maryland Constitution, Article XI-E, sec; 6; see also Coalition for Open Doors v. Annapolis Lodge No. 622, 333 Md. 359, 379, 635 A.2d 412 (1994) (if public general law and municipal ordinance conflict, latter is preempted and thus invalid).
Differences between a public general law and a municipal charter do not necessarily constitute a conflict. Standards set forth in a public general law such as Article 23A are viewed as "`minimum requirements with respect to the affairs of municipalities, [but] . . . Amendment or the statute from providing such additional standards and safeguards as to them seem appropriate.'" Inlet Associates, 313 Md. at 429, quoting Reed v. President and Comm'rs of North East, 226 Md. 229, 249, 172 A.2d 536
(1961). Thus, provisions of public general law and local charter provisions governing municipal finance must be construed together.
B. State Regulation of Municipal Finance
A municipality has broad spending authority. In construing that authority under a municipal charter similar in scope to Hyattsville's, the Court of Appeals noted:
 [T]he Town is expressly authorized "to expend municipal funds for any purpose." This power is extensive, limited only by the Constitutional restriction imposed by Article 15 of the Declaration of Rights that taxes must be laid (and public money spent) "with a political view for the good government and benefit of the community."
Williamsport v. Sanitary District, 247 Md. 326, 331, 231 A.2d 40
(1967). Similarly, Article 23A, § 2(b)(2) provides expansively that a municipality may enact ordinances "[t]o expend municipal funds for any purpose deemed to be public and to affect the safety, health, and general welfare of the municipality and its occupants. . . ."
The public general law sets forth some procedures for the exercise of this broad municipal spending authority. For example, State law prescribes the fiscal year that each municipal corporation must use. Annotated Code of Maryland, Article 24, § 1-102. It fixes the time frame in which the municipal property tax rate must be set and, if the constant yield rate is to be exceeded, it prescribes the procedures a town must follow to set the local property tax rate. Annotated Code of Maryland, Tax-Property Article ("TP"), sec; 6-303 and 6-308. Under certain circumstances, State law authorizes a municipal governing body to alter a rate prescribed in a municipal charter. TP sec; 6-303(b).
Each town must maintain a uniform system of financial accounting determined by the Department of Legislative Services and, after the close of the fiscal year, file a financial report with the Department or risk loss of State funds. Annotated Code of Maryland, Article 19, SEC; 36-39. A municipal corporation must have its finances audited in accordance with State law and file an audit report with the State Auditor. Article 19, § 40. Each municipal corporation must adopt investment guidelines in accordance with those established by the State Treasurer for investment of municipal funds. Annotated Code of Maryland, Article 95, sec; 22F. Other provisions of State law govern the issuance of municipal debt. Article 23A, sec; 31-39; Article 31, § 12.
This list is simply illustrative of State regulation of municipal finance. The supermajority requirement set forth in Article 23A, § 2(b)(2) is another public general law that establishes minimum procedural requirements for certain actions related to municipal finance. Any charter provision governing supplemental appropriations or budget amendments must be construed together with the supermajority requirement in Article 23A, sec; 2(b)(2).
C. Whether There is a Conflict between State Law and the MunicipalCharter
As you note, the finance provisions in the Hyattsville Charter were apparently patterned after former Article 23B a model charter enacted by the General Assembly shortly after the adoption of municipal home rule.[12]
Neither former Article 23B nor the Hyattsville Charter includes a supermajority requirement similar to the one in Article 23A, sec; 2(b)(2).
As stated above, if public general law and a local charter provision conflict, the public general law controls. Thus, if a municipal corporation adopted the model charter in former Article 23B verbatim, to the extent it conflicted with Article 23A, the provisions of the latter article would control. Inlet Associates, 313 Md. at 430 n. 4. However, in construing a local law, any reasonable doubt as to its validity should be resolved in its favor. Reed v. President and Comm'rs of North East, 226 M d. at 248; see also 1A Singer, Statutes and Statutory Construction sec; 30:5 (6th ed. 2002 rev.) ("There is . . . a presumption that . . . two laws can operate harmoniously. . . . [S]pecific ordinances are presumed to be consistent with . . . general state law. . . . A statute and ordinance will not be held to be repugnant to one another if any reasonable construction upholding both can be reached.").
In our view, the supermajority requirement of Article 23A, sec; 2(b)(2) and the procedures in the H yattsville Charter are easily reconciled. The supermajority requirement is a minimum procedural requirement governing supplemental appropriations and alternative use of funds during the course of the fiscal year. The applicable procedure under the Hyattsville Charter requires "[a] t least six (6) affirmative votes . . . for the passage of all ordinances, resolutions or laws," or in other words, a simple majority. Charter, sec; C2-3(k) (emphasis supplied). Thus, as a general rule, a simple majority of the full membership of the Council is adequate for the adoption of an ordinance or resolution, including adoption of the annual budget. Neither this provision, nor similar language under Article 23B,[13] would conflict with a provision that requires a supermajority vote to take a specific type of action. Article 23A, § 2(b)(2) simply delineates an exception, and imposes a stricter requirement for certain types of budgetary actions.[14]
In our view, the procedural provisions of sec; C2-3(k) and sec; C5-8 of the Hyattsville Charter, governing transfer of funds between major appropriations, can be interpreted in harmony with the supermajority requirement of Article 23A, sec; 2(b)(2).[15]
 IV Conclusion
Article 23A, § 2(b)(2) requires that any supplemental appropriation during the course of the fiscal year be approved by at least a two-thirds majority of the municipal governing body. This requirement is a public general law applicable to every municipal corporation and therefore does not offend municipal home rule. In our opinion, the Council's action described in your letter was a supplemental appropriation, to which the supermajority requirement applied. That requirement can be construed consistently with the City Charter provision that requires an affirmative vote of "at least" a majority of the City Council.
J. Joseph Curran, Jr. Attorney General
William R. Varga Assistant Attorney General
Robert N. McDonald Chief Counsel Opinions and Advice
[1] The Hyattsville Charter and Code is available on the municipality's web site, http://www.hyattsville.org/index.html.
[2] Former Article 23B was repealed by Chapter 228, Laws of Maryland 1994.
[3] We understand that normally the City has found it necessary to reduce projected expenditures at this stage to arrive at a balanced budget.
[4] 15 McQuillin, The Law of Municipal Corporations 39.60 (3d ed. rev. 1995).
[5] 4 Sands Libonati, Local Government Law 26.07.
[6] Most municipalities in Maryland use a hybrid form of budget, employing characteristics of a line-item budget as well as other formats, namely, program or performance budgeting. Handbook for Maryland Municipal Officials, pp. 63-65 (1991).
[7] The State budget each year designates moneys for a contingent fund to be used by the Board of Public Works for expenditures related to unforeseen circumstances. See, e.g., Chapter 102, Item DE01.02 ($750,000), Laws of Maryland 2001. However, the creation of this contingent fund is explicitly sanctioned by the Constitution. See Maryland Constitution, Article III, 32; see also 73 Opinions of the Attorney General 43, 54 (1988).
[8] This is not to say that a municipal budget could not include an appropriation for a contingency fund within some specific category of expenditures consistent with the municipality's budgetary format.
[9] Article XI-E, sec; 1, of the Constitution reads:
 Except as provided elsewhere in this Article, the General Assembly shall not pass any law relating to the incorporation, organization, government, or affairs of those municipal corporations which are not authorized by Article 11-A of the Constitution to have a charter form of government which will be special or local in its terms or in its effect, but the General Assembly shall act in relation to the incorporation, organization, government, or affairs of any such municipal corporation only by general laws which shall in their terms and in their effect apply alike to all municipal corporations in one or more of the classes provided for in Section 2 of this Article. It shall be the duty of the General Assembly to provide by law the method by which new municipal corporations shall be formed.
Although the Constitution allows the Legislature to classify municipalities by population into not more than four classes, Article XI-E, sec; 2, the General Assembly has declared that all municipal corporations subject to Article XI-E constitute a single class. Article 23A, § 10.
[10] While Article 23A, § 2, itself predated municipal home rule, the Home Rule Amendment continued pre-existing laws in effect until amended or repealed. Maryland Constitution, Article XI-E, sec; 6.
[11] In proposing the municipal home rule amendment, the drafters recognized that the final determination of the scope of a municipal corporation's authority under the Constitution is best left to the courts. See Commission on Administrative Organization of the State, Second Report: Local Legislation is Maryland, p. 32 (1952) ("Sobeloff Commission").
[12] Former Article 23B was never actually law. It was merely a model available for use by any community desiring to adopt it. Campbell v. Mayor and Aldermen of Annapolis, 289 Md. 300, 310, 424 A.2d 738 (1981). The editor's note accompanying Article 23B in the 1990 replacement volume of the Annotated Code stated that "[Article 23B] is not an effective charter for all towns and it does not actually apply to any municipal corporation. Its sole function is to serve as a guide or model for municipal corporations if and when they revise their charters."
[13] Article 23B, § 11 provided, in part, that "no ordinance shall be approved nor any other action taken without the favorable votes of a majority of the whole number of members elected to the council." 
[14] Of course, since Article 23A prescribes minimum requirements, a municipal charter could require that the governing body approve a supplemental appropriation by a greater majority, e.g., by a three-quarters vote. But if the charter specifically authorized such actions by a simple majority, the two-thirds requirement under Article 23A, § 2(b)(2) would trump the charter provision and the public general law would control. 
[15] In your letter, you state that the town might avoid triggering the supermajority requirement in Article 23A, § 2(b)(2) by making more general appropriations, although such a move would be contrary to the intent of Governmental Accounting Standard Board guidelines. We decline to express an opinion on specific budgetary formats or their impact on financial reporting requirements. We simply note that any action under Article 23A, § 2(b)(2) should be reflected in the municipal government's financial statements. *Page 88