ROY MARTIN BOYD *v.* JOHN SCHAEFER, ET AL.

[No. 18, January Term, 1945.]

*Decided May 16, 1945.*

The cause was argued before MARBURY, C. J., DELA-PLAINE, GRASON, MELVIN, HENDERSON, and MARKELL, JJ.

*James W. Hughes* for the appellant.

*C. Edward Duffy* and *Edward D. E. Rollins*, with whom was *Omar D. Crothers, Jr.*, on the brief, for John Schaefer and Bessie W. Wallis, appellees.

*Hall Hammond, Deputy Attorney General*, with whom was *William C. Walsh, Attorney General*, on the brief, for E. Lee LeCompte, State Game Warden, appellee.

MELVIN, J., delivered the opion of the Court.

In this case the parties in interest, by cross-bills of complaint, are seeking the intervention of a court of equity in their dispute about the location of duck shooting blinds off their adjoining shores on North East River, Upper Chesapeake Bay. The appellant, Roy Martin Boyd, is the owner of a large tract of land known as "White Point Farm," which has a frontage on this river sufficient for establishing three blinds more than five hundred yards apart, by including thirteen hundred feet on an indentation of the river known as Carrot (or Cara) Cove. One of the appellees, Mrs. Bessie W. Wallis, owns the adjoining farm on this cove with a frontage thereon of 1,529 feet. Since 1938 she has been leasing to John Schaefer, another appellee, the one duck blind concession appurtenant to that farm, the location of which has continued in the same spot for many years.

As of June 1, 1942, Schaefer renewed this license—being granted license "No. 1"—and in due course prior to November 10, 1942, erected his blind at the accustomed place off the shore of the Wallis farm. On October 22, 1942, the appellant obtained a license for a blind off the shore of White Point Farm in Carrot Cove, having acquired title to that property by two deeds, one dated June 25, 1942, and the other August 2, 1942. Pursuant to this license he caused a blind to be erected at a point where his predecessor in title, Aida J. Ries, had located a stake under the alleged authority of license "No. 2," obtained by her on June 1, 1942. The record shows

that the Schaefer, or Wallis, blind was actually built in that year prior to his (Boyd's) blind.

After they were both in place, Schaefer complained to the State Game Department that the Boyd blind, designated as "No. 1" to distinguish it from the other two blinds off White Point Farm, was too close to the one he (Schaefer) had previously erected. The Chief Deputy State Game Warden, Richard T. Norris, thereupon visited the premises and, in view of the dispute which had arisen on the very eve of the duck shooting season, ordered both blinds closed—it being later determined that Schaefer's point was well taken. On the night before the opening day of the season Boyd's lessee moved the No. 1 blind sufficiently far to the westward to separate it five hundred yards, at least, from the Wallis blind but left the stake at the place where it had been first located. Within ten days the blind was moved back to that spot and promptly thereafter the pending litigation was started by Boyd. He filed a bill for an injunction, alleging that the Wallis blind, and not his, was the one illegally placed, in that it was less than 1,500 feet from his No. 1 blind in Carrot Cove. Then followed answers to the bill, a cross bill for an injunction against Boyd and those claiming under him, answers thereto and the taking of testimony before the court—all resulting in a decree which established a dividing line extended out over the waters of Carrot Cove, and which enjoined the parties in interest from placing a duck blind within 250 yards of their respective sides of said line, as forbidden by the statute. Code, 1943 Supp., Sec. 49 (a), Art. 99. This line was the one recommended by the warden and was drawn direct from the dividing line of said property at the shore line, bearing north therefrom 5 degrees 4 minutes west, substantially coinciding with a line drawn at a right angle with the shore of the Wallis property as the base.

The practical effect of the decree is to allow statutory space for one blind off the Wallis property and for three blinds off the Boyd property, by requiring the appel-

lant to move his No. 1 blind 258 feet to the westward of his present location, and the appellees, Wallis and Schaefer, to move their blind 45 feet farther to the eastward, so as to maintain the minimum distance of 500 yards apart. It is from this decree that the present appeal was taken by Boyd. The errors assigned are: (1) that in its decree the court did not follow the method prescribed by the statute for extending the dividing line out over the waters of Carrot Cove; (2) that the method employed by the court was not fair or equitable to the appellant; and (3) that the testimony relating to duck blinds off the shore of White Point Farm, other than the "No. 1" blind, should have been excluded.

The decision of the case depends on the interpretation to be given the above mentioned section of the Code in establishing a dividing line, as therein referred to. This section is as follows:

"49 (a). Whenever an owner of land bordering on any waters of this State shall desire to erect a booby, brush, or stake blind in front of his property, or other person to whom he shall give permission, he shall not place same within 250 yards of the dividing line * * * on said waters * * *, meaning a line extending out over the waters drawn direct from the dividing line of said properties at the shore line unless with the consent of the adjoining landowner, same being for the purpose of allowing each landowner bordering on any of the waters of the State permission to avail himself of the privilege of setting, erecting, or maintaining a booby, brush, or stake blind in front of his property, provided he is the owner, lessee, or licensee of the amount of shore frontage as required by law."

The framers of this statute evidently attributed qualities of sportsmanship, fairness and common sense to those to whom it would apply in establishing the dividing line in any case where a conflict might arise, for the directions given are expressed in only broad terms, without attempting to provide a method capable of general application to the curvatures and irregularities of shores lines

and water frontages commonly found among the creeks, coves and rivers of the duck shooting areas of the State. Much is left to the individuals themselves to adjust their differences without resorting to the courts to apply a statute so obviously inadequate to meet the varying conditions naturally incident to shore front properties. While the Act provides that the dividing line shall be one "extending out over the waters drawn direct from the dividing line of said properties at the shore line," it does not prescribe any exact course for the line to take, thus giving rise to much ambiguity and confusion as to just how this language should be applied in practically all cases except those where the shore line happens to be straight. If it be construed to mean that the property line at the junction point on the shore be extended or prolonged directly out over the waters, a manifestly impossible situation would frequently result, making it necessary to adopt some other method in order to accomplish the statute's clearly declared purpose.

That was precisely the situation which arose in the two previous cases which brought this particular section here for interpretation, namely, *Sheehy v. Thomas*, 155 Md. 688, 142 A. 506; and *Councilman v. LeCompte*, 179 Md. 427, 21 A. 2d 535. In the Sheehy case, Judge Urner, speaking for the Court, said: "In order to sustain the plaintiff's contention we should have to construe the statute (the one now in question) as meaning that the imaginary line with reference to which a riparian owner may place his blind must be an extension in a straight course of the dividing line between the adjoining shore properties regardless of any curvatures or irregularities in the line of the shore. * * * The terms of the statute may be difficult or impossible of application under certain waterfront conditions. It is unnecessary and inadvisable in this case to attempt a general statement as to the applicability of the statute to varying shore and property locations. * * * When it is impracticable to locate by extension, according to the statutory direction, a line of water division in relation to which the pre-

scribed restriction on the choice of position for blinds, in front of adjoining riparian lands, may be applied, a conflict in the exercise of the privileges conferred by the statute upon the owners of such properties may be avoidable only by mutual accommodation."

In the Councilman case, *supra,* the Court was confronted by the same kind of difficulty as caused the present controversy in applying this statute to the curvatures and irregularities in the shore lines peculiar to that case. The game warden there, finding that the statutory method of establishing the dividing line would, if followed, deprive one of the landowners of his space for a blind, adopted a method for extending the line which the court held was inequitable in that it would have deprived the the landowner of his space. It was agreed by all concerned, as in the Sheehy case, that the statutory method was inapplicable and that there was no fixed rule which would work equitably in all cases. The Court, through Judge Forsythe, in commenting on this situation, said [179 Md. 427, 21 A. 2d 537]: "Under those circumstances some other method of dividing waters which are common to two properties must be found, and, it must be a method which will be equitable, and fair, to all parties concerned."

The inquiry in the case at bar, therefore, narrows down to this: Was the method recommended by the Chief Deputy State Game Warden, and adopted by the court in its decree, equitable and fair to all parties concerned and in conformity with the declared statutory purpose of allowing each landowner bordering on any of the waters of the State, and having 500 yards of shore frontage, the privilege of erecting a blind in front of his property?

We find nothing in the record that would justify holding to the contrary on this appeal. The appellant did not take the stand himself, and the only witness offered on his behalf was Lawrence M. Crouch, who was an employee of the alleged equitable owner of White Point Farm, T. Woodward Trainer, Jr. Crouch was the one who actually located and built Boyd No. 1 blind in 1942, and was the one, too, who in that year moved the struc-

ture back to the location where he had first placed it. Not only does the testimony of this witness fail to support appellant's claim to the legality of his position but, on the contrary, strongly tends to disprove it. In locating this blind, he testified, he determined the position "from a line from the junction at the water line of the Boyd and Wallis properties on the shore of Cara (Carrot) Cove to a point across Cara Cove, known as Roach's Point, and then placed the Boyd No. 1 blind 750 feet or more (actually 870 feet) westerly from that line." The line referred to is practically identical with the one marked on the plat filed in the case as "North 9° 50' East" from the shore junction point across Carrot Cove to Roach's Point, and which was rejected as being obviously inequitable to Mrs. Wallis. Mr. Norris' testimony to this effect is uncontradicted in the record. To conform to such a line her blind would have to be moved as much as 270 feet in order to give way to the Boyd No. 1 blind and make a space of 1,500 feet between them.

The record shows that that blind location has been established off the Wallis property unchanged for many years. It further shows that in the year 1942, when this controversy came to a head, the lessee, Schaefer, procured his license before anybody else (being issued blind license No. 1), that he placed his stake and built his blind within the statutory time limits, and was all set for the beginning of the 1942 duck season when the appellant erected his blind within 500 yards of the prior Wallis location. The one and only other condition with which Schaefer had to comply in order to confirm his priority was to place his blind at least 250 yards from the dividing line of the Boyd property. All other conditions imposed by the applicable statutes were resolved in his favor, as against the Boyd, or any other, blind.

Prior to the enactment of Chapter 568 of the Acts of 1927, the applicant for a duck blind license did not have to meet any such condition as this, the only one imposed by the statutes being in reference to the distance between the blinds, without any relation to dividing lines extend-

ing out over the waters from the shore. For instance, the statute next preceding that of 1927 (Chapter 568), which was Section 2, Chapter 359, Acts of 1922, simply provided that "No person shall erect a blind in the waters opposite the property of another without the written permission of the owner before the first day of November of each year or within three hundred yards of another licensed blind, the distance to be measured by shore line, if the blind is on the shore, or by air line, if erected in the water."

Then came Section 40 of Chapter 568, Acts of 1927, which is now codified as Section 43 of Article 99 of the Code, 1943 Supplement. This provides: "* * * It shall be unlawful to erect, set, or maintain any blind at a greater distance than 300 yards from the natural shore from which same may be erected. Said blinds shall not be less than 500 yards apart measured in a straight line unless otherwise provided." These words "unless otherwise provided," were added by Section 43 of Chapter 708 of the Acts of 1943.

The section of the Code which has given rise to the conflict in this case is Section 49 (a). This is the secttion which attaches the condition that, in the case of adjoining landowners, no blind shall be within 250 yards of a line extending out over the waters, drawn direct from the dividing line of said property at the shore line, unless with the consent of the adjoining landowner.

In order to interpret this section and to apply it fairly and equitably, it must be considered in connection with the other sections of the Code relating to the licensing of duck blinds. It is also important to bear in mind the historical background of this legislation and its underlying purpose. Duck shooting is a traditional Maryland sport, and the Chesapeake Bay has long been famous for the rare advantages which its waters afford. Wild fowl were reputedly abundant until comparatively recent years and no regulations by statute for shooting them appear earlier than 1832, when two local laws were enacted, one for the Potomac River and one for certain waters of

Harford County, prohibiting the shooting of wild fowl during the night time and under certain other conditions. The first statute regulating the distances for the placing of blinds was Chapter 109 of the Acts of 1860, Section 2. This specified that no person shall shoot from a blind "erected at a greater distance than 100 yards from the natural shore from which the same may be extended." That provision was supplemented by Section 2, Chapter 359 of the Acts of 1922, hereinbefore quoted, which was the first statute prescribing the distance apart for blinds, the said distance to be measured by air line if erected in the water. These two provisions remained in the Code through the edition of 1924.

Up to that time, the land or shore owners had no priority at all in establishing blinds, whether in front of their own property or elsewhere. It was a case of free for all, first come, first served, the only condition being that the blinds must be 100 yards from the shore and 300 yards apart. Then came the Act of 1927 (Chapter 568), supra, which was a complete redraft of the sub-title "Wild Fowl—Birds and Game" of Article 99 of the Code and an elaborate treatment of the whole subject under the sub-title "Water Fowl—Birds and Game." This contributed little, if anything, however, towards co-ordinating the sections relating to the licensing of duck blinds. On the contrary, the ambiguous language in Section 40 (now Section 49a), as above noted, added confusion rather that clarification to this branch of the subject, so that the codification of it has remained more or less patch work.

This Act of 1927 manifestly had a dual purpose: (1). The conservation of water fowl; and (2) the granting of priority to landowners in erecting duck blinds off their shores, provided they comply with certain prescribed conditions. These conditions are embodied in Sections 42, 43, 47 and 49 of the present Code, and are substantially as follows: (Sec. 42) that each of such licensees erect a stake on or before October 10th in each and every year and a blind on that location on or before November

10th; (Sec. 43) that no blind shall be at a greater distance than 300 yards from shore or less than 500 yards apart, measured in a straight line, unless otherwise provided, (this section applying to all blinds and not particularly to those belonging to riparian owners) ; (Sec. 47) that licenses for all blinds shall be issued in rotation, but the clerk of the court shall not accept an application for any such licenses until July of each year, (prior to the enactment of Chapter 708 of the Acts of 1943, the earliest date of issuance being June 1st) ; (Sec. 49a) that no owner of land bordering on the waters of this State shall place his blind within 250 yards of the dividing line of any property owned by him and the adjoining property bordering on said waters, meaning a line extending out over the waters drawn direct from the dividing line of said properties at the shore line, unless with the consent of the adjoining landowner.

In all of the aforegoing enactments it is quite apparent that the original underlying purpose of the legislation in dealing with this subject remained unchanged, namely, to prescribe a minimum distance between duck blinds and from shore. This was not only for the conservation of wild fowl and the protection of those shooting them from duck blinds (*Wampler v. LeCompte,* 159 Md. 222, 150 A. 455), but was also for the promotion of better sport than would result from allowing blinds to be placed closer together.

It is likewise apparent that the placing in the statute of a provision favoring shore owners was not intended to change this basic regulation for licensing duck blinds, but that the spacing of them at least 500 yards apart should remain the governing factor in cases of conflict. Adjoining owners were forbidden to come within 250 yards of the dividing line of the two properties in order, particularly, that no two blinds should be closer than 500 yards, and the course or direction which this dividing line should take "out over the waters" is subordinate to that primary consideration.

Since the passage of the Act of 1927, Chapter 568, there have been just three cases in which this section (49a of Article 99 of the present Code) has been before this Court for consideration, namely, the three hereinbefore cited: *Sheehy v. Thomas* (1928), *Wampler v. LeCompte* (1930) and *Councilman v. LeCompte* (1941).

In the Wampler case, besides ascribing the reason for spacing duck blinds a certain minimum distance apart, the Court also recognized 500 yards as the minimum amount of shore frontage required by law to entitle a riparian owner to priority in erecting a blind in front of his shore property. It did this in connection with its ruling that this section, along with Section 41 as it then stood, while permitting riparian owners with 500 yards or more of frontage to erect blinds opposite their property, but denying it to owners with less than 500 yards of frontage unless they obtained the consent of the adjoining owner, did not involve such an arbitrary classification as to violate the Federal Constitution.

In the instant case, the trial court had before it convincing evidence of a positive nature to support the appellee's position, especially that given by the Chief Deputy State Game Warden, who had made a thorough study of this whole situation in the light of his practical experience of many years in dealing with the subject of locating duck blinds under the confusing and conflicting provisions of the Code. He testified that in order to establish the dividing line according to the intent of the statute, he tried to formulate and devise a plan by which the Wallis property would have one blind and the Boyd property three blinds as theretofore. He further explained: "I was trying to arrange the location of blinds to please everybody and keep them all satisfied, and they would all have some shooting." His final recommendation to the court was made after repeated visits to the premises, taking measurements, and holding conferences with the parties. During the course of the proceedings which, according to the docket entries, extended from November 13, 1942, to September 8, 1944, two hearings were

held before the court and briefs were filed on behalf of all the parties to the cross-complaints. After this long and painstaking consideration of the whole case, the Chancellor's ultimate determination of it was to adopt the warden's recommendation as being fair and equitable, to all concerned, and in conformity with the declared purpose of the statute.

As emphasized in the Councilman case, supra, this purpose was, unmistakably, to protect each landowner's right to have a duck blind, and the decree in the instant case accomplishes that very result. It not only gives to the appellee, Mrs. Wallis, the one blind location to which she is entitled, but also leaves the appellant free to continue with the three locations off his property—since he has sufficient shore frontage for this purpose. Testimony on this latter point, objected to by the appellant, was relevant and admissible as part of the foundation of the equities between these parties. Moreover, while exceptions were taken to some of this testimony, other parts of it went in without objection, and it was a proper subject for consideration by the Chancellors.

It is also relevant and significant to note that the appellant in his bill of complaint does not even allege ownership of a frontage on Carrot Cove of 1,500 feet, which it would be necessary for him to have to support his claim to a duck blind location in the cove. The proof in the case is that his frontage there is but 1,300 feet, whereas Mrs. Wallis' frontage is 1,529 feet. However, by regarding Carrot Cove as simply an indentation of North East River and not a body of water separate from it, the appellant would have ample room for three blinds in the river off his shore, without disturbing to any material extent the location, previously established, of the one blind off the Wallis shore in the cove.

For the reasons above stated and under the law as it now stands, we will affirm the decree of the court below.

We take judicial notice of the fact that subsequent to the date on which this appeal was argued (April 17, 1945) the Governor of Maryland, on May 4, 1945, signed

Senate Bill No. 595, which repealed and re-enacted with amendments two of the very sections involved in the case at bar, being Sections 43 and 49 of Article 99 of the Annotated Code, 1943 Supplement.

While these amendments show on their face that they have a direct bearing on the particular factual situation involved in the instant case, the Act is not made effective until June 1, 1945, and is not retroactive. We are, therefore, on this appeal not called on to construe it or to pass upon its legal effect. The decision of the instant case is on the record as it was presented to us under the existing state of the law.

*Decree affirmed, with costs.*