831 A.2d 77

**COUNTY COMMISSIONERS OF KENT COUNTY, et al.**

v.

**Herschell B. CLAGGETT.**

**No. 2165, Sept. Term, 2001.**

Court of Special Appeals of Maryland.

Aug. 28, 2003.

72

C. Daniel Sanders (Cristina Harding Landskroener, on brief), Ernest S. Cookerly (Cookerly & Barroll, LLC, on brief), Chestertown, for appellants.

Willard C. Parker, II (Wheeler, Thompson, Parker & Counts, LLP, on brief), Easton, for appellee.

Argued before MURPHY, C.J., EYLER, DEBORAH S., SHARER, JJ.

EYLER, J.

This case concerns the competing interests of wild waterfowl hunters and marina owners in Kent County. The question presented is the preemption, *vel non*, by state law of a Kent County ordinance that, as amended, allows certain holders of group boat mooring permits, for two months of the open season for hunting wild waterfowl, to moor vessels in waters where riparian land owners have licenses to maintain and use blind sites.

In a declaratory judgment action brought by Herschell B. Claggett, the appellee, against the Kent County Commissioners ("Commissioners"), one of the appellants, the Circuit Court for Kent County ruled that the Kent County amended

ordinance in question is preempted by implication by provisions of the state wild waterfowl hunting laws, set forth in Title 10 ("Wildlife") of the Natural Resources Article, giving riparian landowners the right to license their shorelines for blind sites; and by conflict with provisions of the state wild waterfowl hunting laws and provisions of the State Boat Act, set forth in Subtitle 7 of Title 8 ("Waters") of the Natural Resources Article, and regulations adopted thereunder. That decision has been appealed to this Court by the Commissioners and by Worton Creek Marina, LLC ("WCM") and Lankford Bay Marina, Inc. ("LBM") (collectively, "the Marina Appellants"), which intervened as defendants below.

We agree with the circuit court that the Kent County ordinance, as amended, is preempted by conflict with the Maryland State Boat Act and its regulations and also is preempted by conflict with the state wild waterfowl hunting laws. Accordingly, we shall affirm the court's judgment.

## FACTS AND PROCEEDINGS

On March 30, 2000, Claggett purchased a 340–acre waterfront farm on Worton Creek, in Kent County. The farm has 4,000 feet of shoreline. Pursuant to Md.Code (2000 Repl.Vol.), sections 10–607 to 10–609 of the Natural Resources Article ("NR"), Claggett applied to the Department of Natural Resources ("DNR") and obtained a license for his shoreline to establish offshore stationary blinds and blind sites for hunting wild waterfowl, for all waterfowl hunting seasons.[1]

WCM is located directly across Worton Creek from Claggett's farm. Pursuant to Article 68 of the Code of Public Local Laws of Kent County (1994)("KCC"), entitled "Boats and Boating," WCM obtained a permit from the Kent County

---

1. An "offshore blind site" is "a specific location in the water where a person may hunt wild waterfowl from a boat that is tied to or anchored at a stake which has been licensed pursuant to this subtitle." NR 10–601(d). An "offshore stationary blind" is "an offshore structure built on pilings or stakes that has been licensed pursuant to this subtitle and used for hunting wild waterfowl." NR § 10–601(e).

Public Landings and Facilities Board ("Board") [2] to maintain 54 commercial boat moorings outside its "extended property line" in Worton Creek and inside Claggett's "extended property line" in Worton Creek.[3] Some of WCM's boat moorings are within 100 feet of Claggett's shoreline. According to Claggett, the boats that occupy WCM's moorings inside his extended property line box in his offshore stationary blinds and blind sites, making them unusable.

Under KCC section 68–7, a permit is required for any person (which includes a marina, *see* KCC section 68–1) to "place, construct or erect a mooring." KCC section 68–9(A) sets forth what are "permitted moorings." Ordinarily, permitted moorings for yachts and pleasure boats must be within "the extended property lines of the M–Marine Zone property." KCC section 68–9(A)(3). Exceptions to this requirement appear in KCC section 68–9(B), however, and include the following "grandfathering" provision for group moorings:

> Group moorings used in connection with permitted marina facilities and group moorings for yacht clubs, community associations and recreation camps [are permitted moorings], subject to the general conditions of this section and provided that:
>
> (a) *All moorings must be located within the extended property lines of the applicant, except that moorings in existence prior to July 1, 1980, being used in connection with permitted marina facilities may be allowed at the discretion of the Board to be outside these property lines....*

KCC section 68–9(B)(2)(a) (emphasis added). Under this "grand-fathering" provision, WCM obtained its permit for boat moorings located outside its extended property line (and inside Claggett's extended property line) in Worton Creek. LBM and five other Kent County marinas also maintain boat

---

**2.** The Board administers and enforces those sections of Article 68 governing mooring structures, *see* KCC section 68–6.

**3.** KCC section 68–1 defines "extended property line" to mean "[t]he dividing line between the adjoining riparian properties which extends from the shore."

moorings in waters in front of property they do not own, under the "grandfathering" provision quoted above.

KCC section 68–10 sets forth "Mooring requirements." Until the enactment at issue in this case, one such requirement, enumerated at paragraph G, was that "[m]oorings in waterfowl blind areas shall be cleared of boats during waterfowl hunting season unless written permission is given by the riparian property owner." Thus, before its language was amended, the ordinance contemplated that, during wild waterfowl hunting season, boat moorings in Kent County waters would be cleared in waters where waterfowl hunting blind sites are situated so moored boats will not interfere with the use of blinds in the same waters.

The open season dates for wild waterfowl hunting are established and published annually by the DNR. NR § 10–407(b). The 2000 to 2001 waterfowl hunting season began on September 1, 2000. 65 Fed.Reg. 164, 51501 (Aug. 23, 2000) amending 50 C.F.R. Sections 20.101–.107, and .109 adopted by NR Section 10–407(b). From then until November 1, 2000, WCM kept boats at its moorings located in Claggett's extended water line, in front of his waterfront property. When Claggett asked WCM to remove the moored boats, it refused. Claggett sought relief from the Board, to no avail. He then filed an action ("the first declaratory judgment action") in the Circuit Court for Kent County, seeking a declaration, *inter alia,* of the meaning of "designated waterfowl hunting season," as used in KCC section 68–10(G).

The Commissioners participated as defendants in the first declaratory judgment action. The court held a hearing and on May 5, 2001, issued a declaration that KCC section 68–10(G) applies to all waterfowl hunting seasons in Kent County, as those seasons are designated by the DNR; that the section applies equally to shore blinds, offshore blinds, and offshore blind sites used in hunting waterfowl, as defined in the Natural Resources Article; and that the section requires the removal of all boats moored or maintained by a permit holder within 250 yards of any licensed shore blind, offshore blind, or

offshore blind site used in connection with hunting of waterfowl *prior to* any waterfowl season in Kent County, as the season is designated by the DNR.

No appeal was taken from that judgment.

On July 3, 2001, by emergency legislation, the Commissioners passed Bill Number 7–2001, which amended KCC section 68–10(G) by deleting the words "designated waterfowl hunting season" and replacing them with language stating that all vessels on commercial mooring buoys shall be removed by November 1 of a given year until March 1 of the following year, unless written permission to maintain the vessels during that time period is given by the riparian property owner. Thus, by virtue of the amendment, commercial mooring buoys in Kent County no longer are required to be removed by the beginning date of the waterfowl hunting season established by the DNR; instead, they may remain in place until November 1 of any given year. Because the wild waterfowl hunting season usually begins in early September, the practical effect of the amendment is to allow "grandfathered" marinas to moor boats in the shoreline waters of riparian property owners for two months of the wild waterfowl hunting season.

By designation of the DNR, the 2001–2002 wild waterfowl hunting season commenced on September 1, 2001. 66 Fed. Reg. 162, 44010 (Aug. 21, 2001) amending 50 C.F.R. sections 20.101–20.107, and 20.109, adopted by NR section 10–407(b). That year, Claggett had obtained a state permit licensing his shoreline for wild waterfowl blinds. Pursuant to KCC section 68–10(G), as amended by Bill Number 7–2001, WCM refused to remove boats from its commercial moorings in Claggett's extended property lines in Worton Creek until November 1, 2001.

On August 16, 2001, in the Circuit Court for Kent County, Claggett filed the declaratory judgment action at bar, seeking a determination that the amendment to KCC Section 68–10(G) was invalid, illegal, and of no force and effect, under the doctrine of preemption, or otherwise was in violation of the Maryland and federal constitutions. He further sought an

injunction prohibiting the Commissioners from enforcing the local ordinance, as amended. As noted, the Marina Appellants, of which WCM is one, were permitted to intervene as defendants.

The court held an evidentiary hearing on September 13, 2001. On November 19, 2001, it heard closing arguments from counsel and made an oral ruling from the bench. The court reviewed the history of the Boat and Boating Article of the Kent County Code; the state legislation governing waterfowl hunting in riparian waters, including provisions specifically applicable to Kent and Queen Anne's Counties; the case law addressing preemption of local law by state law; and the largely undisputed facts of this case.

The court found as a fact that the presence of boats at WCM's moorings in Claggett's extended property lines in Worton Creek from the beginning of the waterfowl hunting season until November 1 made impracticable Claggett's use of his offshore blinds in those waters during that time. The court ruled that KCC section 68–10(G), as amended, is preempted by state law because it is in direct conflict with the state general laws giving Maryland riparian landowners, such as Claggett, the right to the exclusive use of the water in front of their property for licensed blind sites and stationary blinds for the entire waterfowl season (which, as established in the first declaratory judgment action, begins on the date designated by the DNR—September 1 in the year 2001). The court also found that the amended ordinance was in direct conflict with a regulation adopted pursuant to the State Boat Act that provides that when a county is authorized by the state to regulate its own mooring buoy placements, those placements cannot infringe on the rights of any riparian property owner. The court explained:

> And whether we call it a riparian right or whether we call it any other kind of right, this is certainly a right, as I see it, of a riparian owner to use the water in front of his riparian land for hunting from stationary blinds or blind sites during waterfowl hunting season.

The court also found there was preemption by implication, given "the comprehensive system for the licensing of water in front of riparian land which has been continued in this State since 1922."

On December 3, 2001, the court issued a written order granting declaratory and injunctive relief. The order declared, further to the court's oral ruling, that the amendment to KCC section 68–10(G), by Bill Number 7–2001, was preempted by state law and therefore was illegal, null, void, and of no force and effect; and enjoined the Commissioners and their agents, servants, and employees from enforcing the provisions of Bill Number 7–2001 by changing the date for removal of boats from commercial moorings from the commencement of wild waterfowl season to November 1.

The Commissioners and the Marina Appellants, including WCM, noted this appeal, asking whether the circuit court's ruling was legally correct.

## DISCUSSION

### *The Doctrine of Preemption*

The doctrine of preemption of local law by state law is grounded upon the authority of the General Assembly to reserve for itself exclusive dominion over an entire field of legislative concern. When properly invoked, the doctrine precludes local legislative bodies from enacting any legislation whatsoever in the pre-empted field.

*Ad + Soil, Inc. v. County Comm'rs,* 307 Md. 307, 324, 513 A.2d 893 (1986). *See also County Comm'rs v. Days Cove Reclamation Co.,* 122 Md.App. 505, 521, 713 A.2d 351 (1998) (quoting *Ad + Soil, Inc., supra,* 307 Md. at 324, 513 A.2d 893); *Beretta USA Corp. v. Santos,* 122 Md.App. 168, 187, 712 A.2d 69 (1998), *rev'd on other grounds, Prince George's County v. Beretta U.S.A. Corp.,* 358 Md. 166, 177, 747 A.2d 647 (2000); *Mayor & City Council v. New Pulaski Co.,* 112 Md.App. 218, 226, 684 A.2d 888 (1996). Preemption of local law by state law

can be express, by conflict, or by implication. *Talbot County v. Skipper,* 329 Md. 481, 487–88, 620 A.2d 880 (1993).

■ Express preemption occurs when the General Assembly by statutory language prohibits local legislation in a field. *Ad + Soil, Inc. v. County Comm'rs, supra,* 307 Md. at 324, 513 A.2d 893.

■ Conflict preemption occurs "when [a local law] prohibits activity which is intended to be permitted by state law, or permits an activity which is intended to be prohibited by state law." *Talbot County v. Skipper, supra,* 329 Md. at 487 n. 4, 620 A.2d 880. *See also Holiday Point Marina Partners v. Anne Arundel County,* 349 Md. 190, 210, 707 A.2d 829 (1998); *Boulden v. Mayor & Comm'rs,* 311 Md. 411, 415–17, 535 A.2d 477 (1988); *Broadcast Equities, Inc. v. Montgomery County,* 123 Md.App. 363, 393, 718 A.2d 648 (1998), *vacated on unrelated grounds,* 360 Md. 438, 758 A.2d 995 (2000). Yet, "[n]ot all conflicts between state public general and local law neatly fall within this 'prohibit-permit' principle. A local law may conflict with a state public general law in other respects and will, therefore, be preempted." *Coalition for Open Doors v. Annapolis Lodge No. 622,* 333 Md. 359, 380 n. 39, 635 A.2d 412 (1994) (citing *Montgomery County v. Bd. of Elections,* 311 Md. 512, 536 A.2d 641 (1988) (holding that conflict preemption existed when state law and local law provided two different and irreconcilable methods for appointing the same public officials)); *East v. Gilchrist,* 296 Md. 368, 463 A.2d 285 (1983); *Montgomery County Bd. of Realtors, Inc. v. Montgomery County,* 287 Md. 101, 411 A.2d 97 (1980).

■ Finally, preemption by implication occurs when a "local law 'deal[s] with an area in which the [General Assembly] has acted with such force that an intent by the State to occupy the entire field must be implied.'" *Talbot County v. Skipper, supra,* 329 Md. at 488, 620 A.2d 880 (quoting *County Council v. Montgomery Ass'n,* 274 Md. 52, 59, 333 A.2d 596 (1975)). The following factors are relevant to whether a local law is preempted by implication:

1) whether local laws existed prior to the enactment of the state laws governing the same subject matter, 2) whether

the state laws provide for pervasive administrative regulation, 3) whether the local ordinance regulates an area in which some local control has traditionally been allowed, 4) whether the state law expressly provides concurrent legislative authority to local jurisdictions or requires compliance with local ordinances, 5) whether a state agency responsible for administering and enforcing the state law has recognized local authority to act in the field, 6) whether the particular aspect of the field sought to be regulated by the local government has been addressed by the state legislation, and 7) whether a two-tiered regulatory process existing if local laws were not preempted would engender chaos and confusion.

*Allied Vending, Inc. v. Bowie,* 332 Md. 279, 299–300, 631 A.2d 77 (1993) (citations omitted).

██ "In either case, the focus of inquiry [in deciding whether there is preemption] must be on whether the General Assembly has manifested a purpose to occupy exclusively a particular field." *Ad + Soil, Inc. v. County Comm'rs, supra,* 307 Md. at 324, 513 A.2d 893.

In the case at bar, the circuit court found that the practical effect of the amendment to the Kent County local ordinance to designate November 1 as the date by which permit holders for commercial moorings must clear boats—regardless of the date established and set by the DNR for commencement of the wild waterfowl hunting season—was to render useless Claggett's state-issued license of his shoreline for wild waterfowl hunting for the first two months of the wild waterfowl hunting season. The court concluded that the local boat mooring law, as amended, directly conflicted with state laws governing licensing of waterfowl blinds by riparian landowners and state boat mooring laws, and therefore was preempted; and also directly conflicted with regulations adopted under the State Boat Act. Alternatively, the court found that the amendment to the local law was preempted by implication by the state's comprehensive legislation in the field of wild waterfowl hunting.

## *Pertinent State Law on Wild Waterfowl Hunting*

Title 10 of the Natural Resources Article governs "Wildlife," and subtitle 6 addresses "Wild Waterfowl." NR section 10–607 provides at subsection (b) that owners of riparian property in Maryland may license their shorelines annually,

(1) To establish offshore stationary blinds or blind sites for hunting wild waterfowl; and

(2) To prevent other persons from licensing the riparian shoreline for the purpose of hunting wild waterfowl offshore.

A riparian landowner wishing to license his shoreline must do so by June 1 of each year. NR section 10–607(h)(2)(i)(1). If he owns 250 yards of continuous shoreline, or has the written permission of other adjoining landowners to tack on their shorelines, or if no other shoreline is licensed within a specified distance, the riparian landowner may erect an offshore stationary blind or blind site within a certain specified distance of his shoreline. NR 10–607(d) and (f).

Generally, either a Maryland riparian landowner or a Maryland resident who is not a riparian landowner may obtain a license for a riparian shoreline to erect an offshore blind site. NR 10–608(a). Because licensing does not begin until a date set by DNR "on or before the first Tuesday in August," NR section 10–608(c)(4), and licensees of riparian shoreline have the sole right to establish offshore stationary blind sites within the lesser of 300 yards of the licensed shoreline or one-third of the distance to the opposite shore (except in specified areas where the distance is 800 yards), the June 1 shoreline license application deadline for riparian landowners gives them a priority in obtaining blind sites. Moreover, in Kent County, the priority is exclusive because, under NR section 10–608(g), in that county, only a riparian landowner who owns 250 yards of shoreline may erect and maintain a stationary blind or blind site.[4]

---

4. The same exclusive right in riparian landowners applies in Queen Anne's County and on the nontidal waters of the Potomac River and its nontidal tributaries. NR section 10–608(g).

These statutes comprehensively cover the right to obtain, and the means of obtaining, licenses for riparian shorelines for the purpose of erecting offshore blinds for waterfowl hunting, and in the case of riparian landowners, for preventing others from obtaining such licenses. Taken together, the statutes create a general preference for owners of riparian property in Maryland, and an absolute preference for those in Kent County, for obtaining licenses for blind sites for wild waterfowl hunting.

Maryland law has long recognized wild waterfowl hunting preferences for riparian landowners. The General Assembly first enacted legislation regulating duck blinds in 1860. Chapter 109, Acts of 1860. In 1922, by Section 2, Chapter 359, Acts of 1922, it enacted legislation giving riparian landowners priority in establishing and using duck blinds in front of their waterfront property. The 1922 law provided:

[N]o person shall erect a blind in the waters opposite the property of another without the written permission of the owner before the first day of November of each year or within three hundred yards of another licensed blind, the distance to be measured by shore line, if the blind is on the shore, or by air line, if erected in the water.

In 1927, the General Assembly enacted Chapter 568, Acts of 1927, subtitled "Water Fowl–Birds and Game." One of its stated purposes was to grant "priority to landowners in erecting duck blinds off their shores...." *Boyd v. Schaefer,* 184 Md. 621, 630, 42 A.2d 721 (1945). That law provided:

All owners of riparian rights, their lessees or licensees on the waters of this State shall, by virtue of said ownership, be first entitled to make a choice of the "set" or position in front of the property of which they are owners of the riparian rights, lessees or licensees, for the purpose to erect, set or maintain a booby, brush or stake blind or blinds....
(a) For the protection of shoreowners ... desiring to locate a blind or blinds on their shore, the purchase of a license as herein provided and the establishment of a stake on which shall be painted the license number and the name of the

licensee, such stake not to exceed the lawful distance from shore and be established in the water, when said stake shall be established on or before October 10th, then said stake shall be termed as a blind as hereinafter provided.

Md. acts of 1927, ch. 568, § 39.

Over the ensuing 75 years, recodifications of and amendments to the laws giving Maryland riparian landowners priority for obtaining waterfowl hunting blinds have resulted in the priority being diminished somewhat, but still being retained. The Waterfowl Migratory Bird Act, enacted by chapter 568 of the Maryland Acts 1927, gave riparian landowners the right to license the area in front of their property for the purpose of erecting stationary blinds or establishing blind sites. Thus, the law permitted a riparian land owner to license his shoreline for others to use to erect blinds if the owner did not wish to do so himself.

In 1970, the General Assembly again amended what was by then called the Wild Water Fowl Act, by eliminating the "first" priority for all riparian land owners to obtain licenses for blinds and restructuring the issuance of duck blind licenses based on acreage of riparian property owned. The new law established a hierarchy of priorities in which owners of larger parcels of riparian land could seek licenses first, followed by owners of smaller parcels of riparian property. Non-riparian property owners were given third priority. Because the law also provided that blinds had to be spaced a certain number of yards apart, however, a riparian landowner who, by virtue of the hierarchy for application dates received his license before others, had first choice for the location for his blind.

In 1974, the General Assembly recodified the Wild Waterfowl Act, moving it to the new Natural Resources Article of the Maryland Code. Former section 154 of Article 66 C became new NR section 10–612. The recodified statute drew distinctions between licenses for stationary blinds and blind sites, and restructured the filing dates for license applications for each. Riparian landowners continued to maintain their

advantage over others in obtaining licenses for blind sites so their shorelines could be used for wild waterfowl hunting.

In 1999, the General Assembly repealed NR section 10–612 and enacted NR section 10–607 in lieu thereof. NR section 10–607 continues to prioritize the rights of riparian landowners. Its purpose is to allow riparian landowners to license their shoreline properties for hunting of waterfowl or to prevent others from licensing their property for the hunting of waterfowl. The law states, "Riparian landowners may license their riparian shores (1)[t]o establish offshore stationary blinds or blind sites for hunting wild waterfowl; and (2)[t]o prevent others from licensing the riparian shoreline for the purpose of hunting wild waterfowl offshore." NR section 10–607.

NR section 10–607(b) is thus a continuation of the priority granted to riparian landowners by the General Assembly to erect and use wild waterfowl hunting blinds in front of their properties without interference by others.

### Pertinent State Law on Boat Mooring and Kent County Code, Article 68

Title 8 of the Natural Resources Article governs "Waters." Subtitle 7 of that article is the "State Boat Act." The express legislative intention of the State Boat Act is "to foster the development, use, and enjoyment of all the waters in Maryland." NR section 8–702. The State Boat Act is administered by the DNR. NR section 8–703(a).

By Chapter 69, Acts of 1960, the General Assembly passed legislation, now codified at NR section 8–704, authorizing the DNR to adopt a program and implement regulations "relating to the placement of buoys, mooring buoys, and other apparatus used to secure, berth, or moor vessels in the waters of the State." NR section 8–704(b). The statute further directed DNR to "consult with any county affected by the program." *Id.* Under subsection (d), entitled "local regulations," "a municipality or other local authority" is expressly prohibited from "establish[ing] any regulation of a local nature which does not

conform with [the DNR's boat mooring] regulations." NR section 8–704(d).

Pursuant to NR section 8–704(b), and effective May 1, 1979, the DNR adopted regulations, codified at COMAR 08.04.13.01, *et seq.*, governing mooring devices in the waters of the state. The articulated purpose of the regulations is,

to establish procedures and criteria for the placement of moorings in the waters of the State in order to prevent the placement and use of moorings from interfering with access to and use of the waters of the State by the general public and in order to protect public safety and welfare, commercial fisheries, and recreational interests in the waters of the State.

COMAR 08.04.13.01(A). Subsection .02 prohibits moorings from being established in certain locations, proscribes the placement of moorings in which the arc or swing extends into a marked or unmarked channel or interferes with the operation or access through any bridge, and sets forth the manner in which moorings shall be placed, including that "the arc of swing does not impede or obstruct access to the land of any riparian property owner, the access to and proper use of any public access point, or otherwise hinder the orderly access to and use of the waterways by the general public."

Subsection .03 provides that a person may not establish a group mooring without having validly registered with the DNR or a designated local government. It requires group moorings to comply with the conditions stated above for moorings in general, other conditions that are enumerated, and those that may be specified by the DNR for the protection of the public health, safety, and welfare. COMAR 08.04.13.03(D).

The regulations provide that a local government may request, and the DNR then shall establish, a registration program for all mooring facilities located in the waters under the jurisdiction of that local body. Subsection .04(A). If the local government wishes to administer its own registration program, it may do so upon showing that it has "adequate legal

authority to impose the conditions set forth in these regulations." Subsection .04(B). The local government's registration program "may encompass all or part of the standards set forth in this regulation." *Id.*

Subsection .05 of the regulation provides that a mooring owner found to be in violation of the regulations will be held responsible and the violation will be treated "as any other violation of the Natural Resources Code and a citation issued."

Finally, subsection .06, entitled "Property Rights," states that "[t]he placement of a mooring pursuant to these regulations does not ... authorize an infringement upon the rights of any riparian property owner." COMAR 08.04.13.06.

On July 1, 1980, acting pursuant to NR section 8–704(d), the Kent County Commissioners passed Emergency Bill Number 4–80, enacting the mooring buoy regulations that then were codified in Article 68 of the Kent County Code. The local mooring buoy regulations were submitted to the DNR, which determined, by letter of September 9, 1980, that they were "in compliance with COMAR Regulation 08.04.13.04B and [that Kent County had] full authority to administer it's (sic) own Mooring Buoy Regulations Program." The local regulations are those we have discussed above, in our statement of the facts.

### *Riparian Rights*

A riparian landowner is "one who owns land bordering upon, bounded by, fronting upon, abutting or adjacent and contiguous to and in contact with a body of water, such as a river, bay, or running stream." *People's Counsel v. Md. Marine*, 316 Md. 491, 493 n. 1, 560 A.2d 32 (1989). Riparian owners have certain common law rights and also have rights afforded them by statute. *Becker v. Litty*, 318 Md. 76, 82, 566 A.2d 1101 (1989). The essential common law right of a riparian landowner is the right of access to water in front of his land. "The owner has the right, under proper circumstances, to reach that water for purposes such as fishing, bathing, and making certain improvements into the water."

*Id.* at 83, 566 A.2d 1101 (citing *United States v. 222.0 Acres of Land,* 306 F.Supp. 138, 151 (D.Md.1969)).

The common law riparian right of access to water does not include a right of navigation on navigable waters, which is a public, not a private, right. *Becker v. Litty,* 318 Md. at 83, 566 A.2d 1101.

> Every riparian owner has the right of ingress and egress between his land and water. In addition, as member of the public, he has the right to travel on navigable streams. It is important to distinguish these rights. The right to go from his land to the river and from the river to his land is a private property right of the riparian owner. Navigation on public waters is exclusively a public right. Everyone has an equal right to the use of the water for travel and transportation.

*Id.* (quoting *State v. Masheter,* 1 Ohio St.2d 11, 13, 203 N.E.2d 325 (1964)).

Just as riparian rights afforded by common law are property rights, so too are riparian rights afforded by statute. *Becker v. Litty, supra,* at 82, 566 A.2d 1101.

### *Contentions of the Parties*

The Commissioners and the Marina Appellants contend the circuit court was legally incorrect in concluding that the amendment to KCC section 68–10 regulating boat moorings in Kent County was preempted by state laws governing licensing of riparian shorelines for wild waterfowl hunting, either by implication or by conflict, because the state laws, no matter how comprehensive, do not evidence an intention by the General Assembly to occupy another field, *i.e.,* that of boat mooring, especially when state boat mooring laws permit localities to adopt ordinances regulating boat mooring; and the state wild waterfowl hunting laws and boat mooring laws and regulations are not in direct conflict with the Kent County boat mooring ordinance.

Claggett responds that the circuit court correctly found that the comprehensive state laws on wild waterfowl hunting under

which riparian property owners are granted a right to obtain and a priority in obtaining shoreline licenses for wild waterfowl hunting blinds occupy not only the field of wild waterfowl hunting but also necessarily related fields, such as boat mooring, so the local ordinance is preempted by implication; and that, alternatively, the court also correctly concluded that because the amendment to KCC section 68–10 has the practical effect of rendering useless, for two months of the wild waterfowl hunting season, his state-issued wild waterfowl blind licenses, the state wild waterfowl hunting laws, the State Boat Act, and the Kent County boat mooring ordinance are in direct conflict, and the local boat mooring law therefore is preempted.

### Standard of Review

We review the judgment entered in a court trial on the law and on the evidence. Rule 8–131(c). The factual findings of the trial court only shall be disturbed if they are clearly erroneous. *Oglesby v. Williams,* 372 Md. 360, 371, 812 A.2d 1061 (2002). Rulings on the law are reviewed *de novo,* however. *Pickett v. Sears, Roebuck & Co.,* 365 Md. 67, 77, 775 A.2d 1218 (2001); *Calomiris v. Woods,* 353 Md. 425, 434, 727 A.2d 358 (1999).

In this case, the appellants do not challenge the court's factual findings. They challenge the court's legal finding of preemption based on those factual findings. Accordingly, our standard of review is *de novo.*

### Analysis

**Implied Preemption by Legislative Occupation of a Field**

When deciding whether a local ordinance is impliedly preempted by state law, because by comprehensive legislation in a field the legislature has evidenced an intention for the State to occupy it entirely, a threshold question is whether the field pervasively legislated by the State and the field in which the local government has legislated are the same field. The Court of Appeals addressed that issue in *Holiday Point*

*Marina v. Anne Arundel County, supra,* 349 Md. 190, 707 A.2d 829.

One of the questions raised in the *Holiday Point Marina* case was whether a local zoning ordinance imposing a minimum distance between certain marina facilities and shellfish beds was preempted by implication by state legislation over tidal wetlands, water quality, and shellfish. In rejecting that argument, the Court noted that the marina owner's characterization of the relevant "field" was overly broad, and that state regulation of the harvesting of shellfish "is quite distinct from the regulation of the situs of piers. Likewise, state legislation in various fields to insure healthful water quality is distinguishable from local zoning regulations restricting the length of piers." *Id.* at 213–14, 707 A.2d 829. The Court went on to hold that there was no basis for the marina owner's implied preemption argument because the Wetlands Act of 1970, which was the only comprehensive state statute applicable to all pier extensions in the tidal waters of the State, expressly allowed local authorities to adopt more stringent local regulations respecting the locations of new marinas and expansions of existing marinas.

In this case, to be sure, the State of Maryland has comprehensively legislated every aspect of the field of wild waterfowl hunting, for a period of almost 100 years, subject to applicable federal legislation, so as to manifest the legislative intention that wild waterfowl hunting in Maryland be regulated exclusively by the state. It is pursuant to that pervasive state scheme of legislation that riparian property owners have obtained statutory rights to license their waterfronts for wild waterfowl hunting and preferences over others for doing so.

The Kent County ordinance in question here, however, is not an enactment exercising authority over wild waterfowl hunting, or hunting at all; it is an enactment in the field of boat mooring. While wild waterfowl hunting and boat mooring have in common that they are activities that take place on the waters of the state, that shared feature does not mean that legislation in one field is necessarily legislation in the other.

The activities being regulated are different, no matter that they may share a common locus, and one cannot reasonably infer from comprehensive legislation of wild waterfowl hunting by the General Assembly that it intended the state to occupy exclusively the field of boat mooring. Thus, while we can glean from the state's extensive and longstanding legislation an intention by the General Assembly for the state to occupy the field of wild waterfowl hunting, the Kent County ordinance is not within the boundaries of the preempted field.

We also conclude, for different reasons, that the local ordinance is not preempted by implication by the State Boat Act and accompanying regulations. The State Boat Act permits the DNR to regulate the field of boat moorings, and the DNR has done so. The local ordinance directly affects the same subject matter—boat moorings. Yet, the state law expressly provides concurrent jurisdiction to local governments to legislate in the field; boat mooring was regulated locally prior to the enactment of the State Boat Act, see Md. Acts of 1960, ch. 69, § 8(c) (explaining that the Act expressly preempts existing local laws), and local laws existed governing that subject matter; the DNR has recognized the authority of the local governments to act in the field; and the system of state and local regulation has coexisted without chaos or confusion for over 20 years. These factors make plain that the General Assembly did not intend that the state exclusively occupy the field of boat mooring.

### Preemption By Conflict With State Law

The question remains whether the amended ordinance is preempted by conflict with state law—either with the state laws governing wild waterfowl hunting or with the State Boat Act.

As noted above, while the ordinary test for conflict preemption is whether the pertinent local law prohibits an activity permitted by state law or permits an activity prohibited by state law, "[n]ot all conflicts between state public general and local law neatly fall within this 'prohibit-permit' principle. A

local law may conflict with a state public general law in other respects and will, therefore, be preempted." *Coalition for Open Doors v. Annapolis Lodge No. 622, supra,* 333 Md. at 380 n. 39, 635 A.2d 412. The federal case law of preemption of state law by federal law under the Supremacy Clause recognizes not only the "prohibit-permit" type of conflict preemption but also the "frustration of purpose" type of conflict preemption.

"Frustration of purpose" conflict preemption happens when " 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress' " in enacting the federal law. *Crosby v. Nat'l Foreign Trade Council,* 530 U.S. 363, 373, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000) (quoting *Hines v. Davidowitz,* 312 U.S. 52 n. 20, 67, 61 S.Ct. 399, 85 L.Ed. 581 (1941)). *See also Geier v. Am. Honda Motor Co.,* 529 U.S. 861, 120 S.Ct. 1913, 146 L.Ed.2d 914 (2000) (holding that a state common law claim seeking to require automobile manufacturers to install airbags would frustrate the purposes of the federal safety standard regulations adopted under the Federal Motor Vehicle Safety Act, which did not require manufacturers to do so, and therefore was preempted by conflict); *Int'l Paper v. Ouellette,* 479 U.S. 481, 497, 107 S.Ct. 805, 93 L.Ed.2d 883 (1987) (holding that state common law claims were preempted by frustration of purpose conflict with the Federal Clean Water Act and noting "[i]t would be extraordinary for Congress, after devising an elaborate permit system that sets clear [effluent discharge] standards, to tolerate common law suits that have the potential to undermine the regulatory system"); *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.,* 450 U.S. 311, 101 S.Ct. 1124, 67 L.Ed.2d 258 (1981)(holding that a state common law claim against a railroad for failure to provide adequate services after the railroad abandoned a line was preempted by frustration of purpose conflict with the Interstate Commerce Act, which delegated to the Interstate Commerce Commissioner the authority to regulate abandonment of lines by carriers

and broad discretion in determining whether abandonment should be permitted).

In this case, we conclude that the amendment to Kent County's local boat mooring ordinance was preempted by conflict, of the "prohibit-permit" sort, with the State Boat Act and regulations promulgated thereunder; and also was preempted by conflict, of the "frustration of purpose" sort, with the state wild waterfowl laws.

The State Boat Act expressly prohibits a municipality or other local authority from adopting a local boat mooring regulation that does not conform to the DNR's boat mooring regulations. NR section 8–704(d). The DNR's boat mooring regulations allow local governments to adopt their own boat mooring regulation programs, which may incorporate some or all of the standards contained in the state boat mooring program; but the state regulations do not authorize the placement of moorings when doing so infringes upon the rights of a riparian property owner. COMAR 08.04.13.03(c)(2). Thus, while localities can adopt their own mooring regulation programs, with the DNR's approval, and need not adopt all the standards of the state mooring program, the local regulations cannot allow moorings to be placed so as to infringe on the rights of a riparian property owner.

For the reasons we have explained, riparian property owners in Maryland have a statutory right to license their shorelines for blind sites, and indeed have preferences for doing so, and to use the blind sites permitted by their licenses for wild waterfowl hunting by themselves or others, during the entire wild waterfowl open season. Before the local boat mooring ordinance in this case was amended, it required "grandfathered" marinas that were permitted to place moorings in the waters constituting shorelines of riparian property owners to clear the moorings when wild waterfowl hunting season began; in that way, the placement of the moorings would not infringe on a riparian property owner's statutory right to license and use his shoreline for wild waterfowl hunting. As amended, however, the local ordinance permits for two months a year

"grandfathered" marinas to use their moorings to do what the State Boat Act and accompanying regulations prohibit—infringe on the rights of riparian property owners to use their licensed shorelines for wild waterfowl hunting by surrounding their licensed blinds with boats. Because the local boat mooring ordinance permits an activity prohibited by the state boat mooring laws, it is preempted by conflict.

 For much the same reason that the local amended boat mooring ordinance is not impliedly preempted by the state wild waterfowl hunting laws, it is not preempted by the "prohibit-permit" type of conflict with those laws. In *Holiday Point Marina, supra,* the Court examined whether the local zoning ordinance imposing a minimum distance between certain marina facilities and shellfish beds was preempted by conflict by the state legislation over tidal wetlands, water quality, and shellfish, and held that it was not because the local and state legislation "regulate[d] entirely separate and distinct activities." 349 Md. at 211, 707 A.2d 829.

> The local ordinance restricts the location of marina facilities, whereas the state document restricts the harvesting of shellfish. While both may be designed to further the ultimate public policy of protecting consumers from shellfish that may be dangerous to health, the local ordinance and the state document employ wholly different means to further such public policy.

*Id.*

Likewise, in the case at bar, the state wild waterfowl legislation regulates the time, location, and manner in which people may hunt wild waterfowl in Maryland, and provides certain preferences for doing so to riparian property owners, while the local ordinance regulates the use of boat mooring buoys in the waters of Kent County. In the words of the Court of Appeals, these are "entirely separate and distinct activities." The local ordinance restricts the placement of mooring buoys. It does not purport to place limitations on wild waterfowl hunting.

We agree with the circuit court, however, that even though the fields of legislation are not the same, that is, boat mooring and wild waterfowl hunting, the amended local boat mooring regulation in this case frustrates the purpose of the state blind site licensing laws by preventing holders of licensed shorelines from using them during part of the wild waterfowl hunting season. The full purpose of the state wild waterfowl hunting laws set forth in NR 10–601 *et seq.* is to with strict regulation allow priorities of people, with riparian property rights having top preference, to license shorelines for hunting on their waters, by them or by others, during the season designated by the DNR. The amended local ordinance in this case stands as an obstacle to that purpose, because it effectively prevents the license holders from being able to use their blind sites.

Accordingly, for the reasons we have explained, the circuit court properly ruled that the amendment to KCC section 68–10(G), to the extent it allows group moorings outside the extended property lines of the permittee, during any part of the wild waterfowl hunting season as designated by the DNR, is preempted by conflict with state law.

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.**